*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CF-1604, 12-CF-1605, and 12-CF-1504

FURL J. WILLIAMS,
ARTHUR TERENCE BULLOCK, and
MARTEESE NORMAN, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-3568-12, CF3-3570-12, and CF3-3569-12)

(Hon. Gerald I. Fisher, Trial Judge)

(Argued May 15, 2014                                    Decided April 23, 2015)

*Peter H. Meyers* for appellant Williams.

*Abram J. Pafford* for appellant Bullock.

*Daniel M. Gonen*, Public Defender Service, with whom *James Klein* and *Jaclyn S. Frankfurt*, Public Defender Service, were on the brief, for appellant Norman.

*David B. Goodhand*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello* and *Holly Shick*, Assistant United States Attorneys, were on the brief, for appellee.

Opinion for the court by *Senior Judge* REID.

Concurring opinion by *Associate Judge* FISHER at page 24.

Before WASHINGTON, *Chief Judge*, FISHER, *Associate Judge*, and REID, *Senior Judge*.

REID, *Senior Judge*:   In these appeals, appellants Furl J. Williams, Arthur Terence Bullock and Marteese Norman, challenge their convictions of robbery[1] on various grounds – (1) insufficiency of the evidence (Mr. Williams and Ms. Norman), (2) erroneous denial of a motion to sever (Mr. Williams and Mr. Bullock), (3) erroneous denial of a motion to suppress (Mr. Williams and Mr. Bullock), and (4) abuse of discretion in dismissing a juror (Ms. Norman).   Because of our disposition, we consider only the first issue.   We hold that the evidence was insufficient to convict Mr. Williams, Ms. Norman and Mr. Bullock of robbery because the government's proof failed to establish at least one of the elements of that offense beyond a reasonable doubt.   Consequently, we reverse appellants' robbery conviction.

---

[1]   Robbery is a violation of D.C. Code § 22-2801 (2012 Repl.).   The jury found Mr. Williams, Mr. Bullock, and Ms. Norman not guilty of conspiracy to commit robbery.

3

**FACTUAL SUMMARY**

The government presented evidence showing that Loi Chau, a forty-nine year-old man, worked the 2:30 p.m. to 11:00 p.m. shift at the Marriott Hotel on Connecticut Avenue, in the Northwest quadrant of the District of Columbia.[2]  Mr. Chau testified as follows.   After getting off from work on the night of February 24, 2012, he walked to the nearby Metro Elevator.  As he "was pushing the button, waiting for the elevator to come up, [he] saw three people walk to him, and [he] did not know these people.   And [he] ke[pt] pushing the button, waiting for the elevator to come up."   The prosecutor asked, "[W]hat did those three people look like?" Mr. Chau responded, "They are three black Americans.  I don't know them, so I keep pushing the button, waiting for the elevator."   The people did not say anything but they "look[ed] back" at him and then approached Mr. Chau.   They were about three to four feet from Mr. Chau, and he could "[n]ot quite touch them."   Mr. Chau "was afraid that they had guns or knives," so he "took out [his] wallet and gave it to them and they left."   Although he did not see any guns or knives, he "was afraid they [had] guns and knives because at that time it was very dark, and [he] was the

---

[2]  Mr. Chau spoke Vietnamese and had limited knowledge of the English language.  There was no Vietnamese interpreter on the scene at any time on the night of the incident and the investigation.

only one there."   He repeatedly said he was afraid the people had (a) gun(s) and/or (a) knife/knives.   But on cross-examination Mr. Chau stated that the three people did not threaten him or make him afraid.   See note 5, *infra*.

When the three people approached him two of them said, "What, what, what." Mr. Chau interpreted these words to mean, "do I have any money."[3]   He did not have any money.   His wallet contained his driver's license, Metro card, bank cards, union cards, and business cards.   Initially Mr. Chau saw the faces of the three people when they were by the elevator where there was a light, but when they walked away he could only see their backs.   Mr. Chau called 911 and reported that the people "took [his] money and they walked away."   Mr. Chau spoke only "a little bit" of English and another man on the street helped him with the 911 call.[4]   Mr. Chau followed the people who had his wallet so that he could retrieve his Metro card.   He was about three blocks behind the three individuals but never lost sight of

---

[3]   The prosecutor inquired, "Why do you say they were asking for money?" Mr. Chau answered, "No, they said, 'what, what,' and their intention when they approached me."   The prosecutor did not ask for clarification of Mr. Chau's response.   According to Mr. Chau, the third person was quiet.   Mr. Chau "didn't know how to say" "the robbery word," so he told the 911 operator that "they took money from me," and "they took my money and they walked away."

[4]   Mr. Chau understood the 911 operator's question as to where he "was heading," but the operator "said a lot of other things that [he] did not understand."

them.  Another man also followed the three young men.  Later, the police stopped the three people and Mr. Chau identified each of them.[5]

On the night of February 24, 2012, Metropolitan Police Department ("MPD") Officer Kenneth Boone, a technician, had completed an assignment and was driving southbound on Connecticut Avenue shortly after 11:00 p.m., in an unmarked car and plain clothes.  While he was waiting for the traffic light to turn green, he saw the backs of what appeared to be "three black males . . . in front of [another] male."  He thought that the single male was "not free to move forward, he didn't have his freedom of movement."  Officer Boone saw the three males walk away northbound on Connecticut Avenue, and he proceeded to where the single male was standing, in order to check on him.  The man, later identified as Mr. Chau, looked "[k]ind of … confused, kind of shocked."  Mr. Chau said, "they took everything."  Officer

---

[5]  On cross-examination, Mr. Chau reiterated that there was no money in his wallet.  When he called 911, however, he stated, "My money, my money, my money" several times.  He explained that he "did not know how to use the term 'rob'" and he used a word he knew "so that the police can come fast."  He admitted that none of the defendants pushed or touched him, and that only two asked for money but he asserted that "all three of them went together."  He agreed that none of the defendants "threatened to hurt [him] if he didn't hand over [his] wallet."  Although Mr. Chau said he was afraid, he added that the three defendants "did not make – threaten me or make me afraid," and he saw no weapons – guns or knives.  Mr. Chau did not give a description of the persons who took his wallet when he called 911.

Boone kept his eye on the three males who were walking north on Connecticut Avenue and followed them, and contacted the police dispatcher on his cell phone. He advised the dispatcher that the three men were wearing "black jackets and . . . black hats." He followed the three men until they reached a "7-Eleven" store where they stopped to speak with two men who were seated, before continuing up Connecticut Avenue. One man slowed down at a bus stop and the other two turned off onto and down a walkway near an apartment building. The two men eventually turned around and came back to Connecticut Avenue as the police arrived. Officer Boone introduced himself to the arriving officers and then left the scene.

Samuel Hart testified that he was coming up a Metro escalator on Connecticut Avenue when he "noticed like a Chinese [or] Korean [man] with three suspects standing in front of him."[6] He was about thirty feet away from Mr. Chau and the three young people. One person had on a black hoodie; one had on red, white and black sneakers; two had dreads; and they had on dark jeans. One of the Asian man's legs appeared to be short and the three persons around him "looked suspicious

---

[6] Mr. Hart demonstrated how Mr. Chau and the three young people were situated on the street. As a result of the demonstration, the trial judge stated, "I would say about a 90 degree angle between Mr. Hart, and the other three were in kind of a little bit of an arc around him, reaching around him."

at a certain time on Connecticut Avenue" because "a majority of rich middle class people live" on Connecticut Avenue and people with hoodies and "all dark clothing" are not seen after eleven or twelve o'clock. He saw three black men, one of whom was "light-skinned." One person was "observing the scenery" or "looking around to see if anybody else can see it." Two of the men spoke with the Asian man and "one took the wallet." The three men walked up Connecticut Avenue, and Mr. Hart asked the Asian man whether something was wrong. The man stated that he "just got robbed his wallet," and Mr. Hart told him to call 911. Mr. Hart also called 911 and then followed the three men. When the men reached the area of a "7-Eleven" store and an apartment building, Mr. Hart saw the one with the red, black and white sneakers, hat and black hoodie veer off through a cut near the apartment building and then "run[] out to be with the other two." Mr. Hart flagged down the police when he saw their cars.

Mr. Hart stated on cross-examination that two of the men had hair in dreadlocks, and one of them wore red, white and black shoes; and that the third person had a shorter haircut and had a hat on.[7] He testified before the grand jury

---

[7] Mr. Hart acknowledged that he did not give a description of the three people during his 911 call.

that the man with the red, white and black shoes took Mr. Chau's wallet. He "assumed" Mr. Chau was being robbed "[b]ecause he kept yelling 'help.'" He denied that he had a prior possession of cocaine conviction in 1999.[8] He also initially denied that he had consumed two 12-ounce cans of beer on the evening of the incident. He noted that since the incident he had had surgery for a brain tumor.

Officer Walter Pankowski testified that he was on duty in an unmarked police car with other officers when he heard "a call for a robbery that had just occurred." The officers saw an Asian male waving them down as they approached the 3000 block of Connecticut Avenue. Mr. Chau was "excited" and said, "they took my wallet, they took my wallet." Mr. Chau was walking toward the bus stop saying, "up there, up there, up there." Officer Barcus had stopped Mr. Bullock; and when Mr. Chau reached the place where Mr. Bullock was standing, he stated, "He took my

---

[8] Counsel for Mr. Bullock read the following stipulation to the jury during the presentation of evidence by the defense: "The parties in this case, we stipulate and we agree that Samuel Michael Hart was convicted of the following offenses: He was convicted of false report to the police in August of 2009; possession of a prohibited weapon in Fairfax in August 2003; escape, December 2001; theft in the second degree, 2001; Bail Act violation, 2008; possession of cocaine, April 30th, '99; theft in the second degree, and Bail Reform Act violation in '96."

money, it was him, it's him."[9]   Mr. Williams and Ms. Norman were in "close proximity" to Mr. Bullock.

Officer James Legasi responded to the scene and stopped Ms. Norman.   She had on a black hat.   He handcuffed Ms. Norman, and when he began to pat her down, she told Officer Legasi that she was female and her name was LaKeisha Wilson.   Officer Legasi also recovered the clothing that Mr. Williams was wearing on the night of the incident and the clothing matched the lookout description for one of the suspects.   A Metro smart trip card was inside one of Mr. Williams's pockets. Officer Legasi identified Mr. Williams in court.   In addition, Officer Legasi found a green credit card in the 2700 block of Connecticut Avenue that bore Mr. Chau's name, as well as Mr. Chau's wallet.[10]   However, Officer Legasi also denied that he had found a wallet.

---

[9]   Officer Barcus(s) did not testify at appellants' trial.   The affidavit, attached to the complaint against appellants, only references Officer Barcus's conversation with Mr. Hart on the night of the incident.   The government does not mention the alleged statement by Mr. Chau about money that Officer Pankowski testified was made while Officer Barcus detained Mr. Bullock.   The government only cites the testimony of Detective Tabron.   Officer Barcus's name appears as both Barcuss and Barcus in the record.

[10]   Officer Legasi indicated that he and other officers canvassed the area from the 3000 block of Connecticut Avenue, where Ms. Norman was stopped, to the 2600 block, where the offense occurred.   Officer Adrian Harris found a white and red, or a white credit card in the grassy area in the 2700 block of Connecticut Avenue, in

(continued…)

Officer Adam Crist proceeded to the 3000 block of Connecticut Avenue with Officer Legasi. They saw Mr. Williams and Ms. Norman standing together. Officer Crist stopped Mr. Williams. He then canvassed the Connecticut Avenue area near the stop, found a wallet in the bushes in the 2700 block, between the sidewalk and the apartment building, and secured the wallet without touching it. On cross-examination, he declared that the lookout was for "three black males wearing all dark jackets."

MPD Detective Keith Tabron investigated the incident involving Mr. Chau. When he arrived on the scene he interviewed Mr. Chau and took him back to the place where he first saw the defendants. Detective Tabron testified that he had "[j]ust a very little" trouble understanding Mr. Chau, and that he posed "[v]ery short" and "very narrow," direct questions to him. He also conducted an identification show-up procedure in the area where the defendants were stopped. He was seated in the front of a police car and Mr. Chau was in the back. According to Detective Tabron, the following occurred.

---

(…continued)
front of an apartment building. Mr. Chau's name was on the card. Ninotchka Sylvester, an MPD civilian crime scene technician processed the crime scene and found a debit or credit card on the ground near a curb, and one farther up near the apartment complex. She dusted these items for fingerprints but found none.

The suspects were brought out separately. Mr. Chau identified Ms. Norman as the person to whom he gave his wallet. She was wearing a hat. Mr. Chau identified Mr. Williams and said he "was demanding money from him"; that he "was asking for money." Mr. Chau also identified Mr. Bullock and declared that he "was asking for money from him." On cross-examination Detective Tabron stated that he did not ask Mr. Chau for physical descriptions of the alleged persons who took his wallet before he identified the suspects. Detective Tabron acknowledged that when he testified before the Grand Jury, he was asked whether he could understand Mr. Chau on the night of the incident; and he replied, "Vaguely." The detective did not seek to get an interpreter. In his WACIIS report, Detective Tabron wrote that Mr. Chau "said that all three subjects were demanding money at the same time they were pushing and shoving [him]." On cross-examination at trial, Detective Tabron also was asked whether he "thought that Mr. Chau said that he was pushed by the suspects?" He replied, "No, I didn't thought [sic] that Mr. Chau said he was pushed by the subjects." Defense counsel inquired, "You didn't think that?" Detective Tabron replied, "No, I should have written that Mr. Chau was asked if he was pushed or shoved by the subjects, and he just went, "yeah, yeah, yeah," so I interpret that as yes." Defense counsel then stated, "Because you asked him a question and he said yes?" Detective Tabron replied, "Yes."

All three defendants moved for judgment of acquittal before presentation of evidence by the defense. After listening to the arguments of defense counsel in favor of the motion and taking issue with recollections about some of the testimony, the trial court denied the motion on the ground that "there's sufficient evidence for those charges." The court declared that, "If the only evidence had been Mr. Chau's direct testimony, or maybe where he was at the end of cross, . . . maybe, and I say maybe there would be insufficient evidence." The court continued saying, "[O]n redirect examination my recollection was that, and my recollection is clear that he was impeached with his prior inconsistent statement before the Grand Jury in which he stated that the individuals asked for money, put in tandem with their physical conduct, they were within a foot or so of him late at night on a fairly empty street after walking by him and after coming close." The court also stated that "once [Mr. Chau] gave the wallet, . . . the fact that they accepted the wallet and went away with it, I think there's some circumstantial evidence about what their intent was to begin with."[11] The defendants renewed their motion for judgment of acquittal at the end

_____

[11] The trial court actually was mistaken in its recollection of the redirect testimony of Mr. Chau. Although the prosecutor sought to bring out other words that the defendants said to Mr. Chau, other than "what, what, what," and specifically the words, "Where's the money," she was unsuccessful during redirect examination. When the prosecutor tried to get Mr. Chau to remember his April 6, 2012, Grand Jury testimony, he was unable to do so. The prosecutor read a question from the Grand Jury testimony, "What happened after [the three people] looked at you?"

(continued…)

of the presentation of all evidence. The trial court denied the motion for the same reasons it articulated earlier.

## ANALYSIS

Although all of the defendants argued for acquittal at trial on the ground that the evidence was insufficient to establish a robbery, only Ms. Norman and Mr. Williams contend on appeal that the government failed to prove the elements of a robbery. "In reviewing a conviction for sufficiency of the evidence, we consider all the evidence in the light most favorable to the government, according deference to the fact-finder 'to weigh the evidence, determine the credibility of the witnesses, and draw all justifiable inferences of fact . . . .'" *Jones v. United States*, 67 A.3d 547, 549 (D.C. 2013) (citation omitted). "[I]f a trier of fact could find the essential elements of the crime beyond a reasonable doubt, we must affirm the convictions." *Lattimore v. United States*, 684 A.2d 357, 359 (D.C. 1996) (citation omitted). "Conversely, we must reverse if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Id*. (internal quotation

---

(…continued)
Before she could read his answer, Mr. Chau replied, "When they looked at me, then they just said, 'What, what?'" The prosecutor tried again, and Mr. Chau said, "Then three people approach me and two people said, 'What, what?'"

marks and citations omitted). "[T]he evidence in a criminal prosecution must be strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt. . . . The evidence is insufficient to convict if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (internal quotation marks and citation omitted); *see also United States v. Wagstaff*, 865 F.2d 626, 629 (4th Cir. 1989) (to determine whether the fear or intimidation requirement for robbery has been met, courts may not "substitute[] a set of assumptions about the person taking money . . . for the individualized analysis of that person's actual behavior"). In sum, "if the evidence, when viewed in the light most favorable to the government is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime, then the evidence is insufficient and we must say so." *Rivas*, *supra*, 783 A.2d at 134 (emphasis in original) (internal quotation marks and citation omitted).

D.C. Code § 22-2801 (2012 Repl.) provides:

> Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery.

We have said that "[i]n the District of Columbia, robbery retains its common law elements," and that "the government must prove larceny and assault." *Lattimore*, *supra*, 684 A.2d at 359 (citations omitted). The elements of robbery are: "(1) a felonious taking, (2) accompanied by an asportation [or carrying away], of (3) personal property of value, (4) from the person of another or in his presence, (5) against his will, (6) by violence or by putting him in fear, (7) *animo furandi* [the intention to steal]." *Id*. (alteration in original) (citations omitted).

On this record we conclude that the government failed to prove the element of "violence or putting [a person] in fear." No violence was involved in this case, and thus, our focus is on "fear." To prove the "putting in fear" element, the government must establish some "menacing conduct of the accused and his purposeful design … to engender fear in . . . [the] victim." *Parks v. United States*, 627 A.2d 1, 5 (D.C. 1993) (internal quotation marks and citations omitted). The test is not whether the victim experienced actual fear or had a "subjective perception" of fear, but "whether the assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility. . . ." *Id*. (citation omitted); *see also In re D.R.*, *supra*, 96 A.3d 45, 47 n.2 (D.C. 2014) (in "an intent-to-frighten assault, the government must show that the defendant committed

some threatening act that would lead a reasonable person to believe he was in imminent danger of bodily harm") (internal quotation marks and citation omitted); *Parnell v. Oklahoma*, 389 P.2d 370, 375 (Okla. Crim. App.) ("Intimidation in the law of robbery means putting in fear, and the fear must arise from the conduct of the accused rather than the mere temperamental timidity of the victim.").

Fact-finders may reasonably infer a defendant's "present ability to either injure or frighten the victim" from the display of a weapon by the defendant. *Parks*, *supra*, 627 A.2d at 6. Fact-finders also may infer the fear element from words spoken by the defendant or by his conduct. *See Owens v. United States*, 497 A.2d 1086, 1090 (D.C. 1985) ("An intent to commit robbery may be inferred not only from the words uttered by the suspect but also from his conduct or from the totality of the evidence.") (internal quotation marks and citation omitted); *see also In re D.R.*, *supra*, 96 A.3d at 47 n.2 ("brandish[ing] a large knife and angrily threaten[ing] to eviscerate [defendant's] neighbor with it . . . is certainly sufficient to support a finding that [defendant's] statements would have put a[] . . . reasonable person in apprehension of bodily harm") (internal quotation marks omitted); *United States v. Ketchum*, 550 F.3d 363, 367 (4th Cir. 2008) ("intimidation element [of a federal bank statute] is satisfied if an ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts, whether or not the

defendant actually intended the intimidation"; "intimidation generally may be established based on nothing more than a defendant's written or verbal demands to a teller"); *United States v. Gilmore*, 282 F.3d 398, 403 (6th Cir. 2002) ("unequivocal written and verbal demands for money to bank employees are a sufficient basis for a finding of intimidation" under a federal bank statute).

Here, there was no showing of an objectively reasonable fear on the part of Mr. Chau. Indeed, he testified that the defendants "did not . . . threaten [him] or make [him] afraid." Undoubtedly, Mr. Chau had a subjective fear because it was late at night when three young people (whom he described, when asked, only as "three black Americans") walked by him and he thought that they had knives or guns. The government insists, however, that "appellants' actions . . . created a reasonable fear of danger in Mr. Chau" because they "surrounded Mr. Chau *en masse*, '[a]ll three together' . . . in an arc, depriving him 'freedom of movement.'" In addition, "while one of the three looked around to ensure that no one else was watching, another asked Mr. Chau for his money and the third took the wallet." Furthermore, the government continues, Mr. Chau "was out-numbered by appellants," and his "vulnerability was significantly enhanced by the fact that there were few people out and about." Moreover, the government argues, (a) appellants first walked past Mr. Chau, "look[ed] back at him, and then returned to his location";

(b) "possession of an undisclosed weapon may be inferred from the surrounding facts and circumstances" such as wearing a jacket which would have raised concern about a concealed weapon; and (c) appellants "did not return Mr. Chau's wallet after Mr. Chau offered it."

Part of the difficulty with the government's arguments on this record is that the government "substitutes a set of assumptions about [the appellants] . . . for the individualized analysis of [the appellants'] actual behavior." *Wagstaff*, *supra*, 865 F.2d at 629. Moreover, at times the government appears "to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Rivas*, *supra*, 783 A.2d at 134 (citation omitted). Government assumptions, conjecture and speculation are most evident, perhaps, with respect to whether Mr. Chau stated on the night of the incident that two of the appellants actually demanded money or asked Mr. Chau for money.

Mr. Chau's consistent testimony is that the only words actually uttered by two of the appellants were, "What, what, what." When the prosecutor attempted to elicit specific language showing that two of the appellants unequivocally asked for money, she was unsuccessful. In response to the prosecutor's question, "Why do you say they were asking for money," Mr. Chau replied, "No, they said 'what, what,'

and their intention when they approached me." The language "and their intention when they approached me" does not translate into a specific demand for money. Even if we look to Detective Tabron's testimony that Mr. Chau said that Mr. Williams was demanding or asking for money, and that Mr. Bullock was asking for money, we cannot say that Detective Tabron's hearsay testimony would be "strong enough that a jury behaving rationally really could find it persuasive [as to the fear element] beyond a reasonable doubt." *Rivas*, *supra*, 783 A.2d at 134. Detective Tabron testified before the grand jury that he could understand Mr. Chau (who spoke only "a little bit" of English) "[v]aguely" on the night of the incident. At trial, a defense counsel asked Detective Tabron whether he "thought that Mr. Chau said that he was pushed by the suspects?" The Detective said, "No," he didn't think so, and that he should have written in his WACIIS report "that Mr. Chau was asked if he was pushed or shoved by the subjects, and he just went, 'yeah, yeah, yeah,' so I interpret that as yes."[12] Given the demanding standard of "beyond a reasonable doubt," and

---

[12] The government acknowledges Mr. Chau's "language" and "understanding" issues and his "difficulty with English." But in footnotes, the government makes at least two major assumptions about Mr. Chau's testimony that two of the appellants said, "What, what, what" when they approached him. First, Mr. Chau said, "What, what, what" "*after* he had given appellants his wallet" since the "statement makes more sense in that context, because appellants were likely mocking Mr. Chau's request and/or his poor English." Yet, there is not a shred of credible evidence that appellants mocked Mr. Chau or his command of the English language. The government's second assumption (indeed speculation) is that "Mr.

(continued…)

Detective Tabron's grand jury and trial testimony as cited, we are left with doubts as to whether Detective Tabron merely assumed what Mr. Chau told him during his investigation of the incident.

The government cites little case law in its analysis of the fear element. It appears to rely principally on *Dublin v. United States*, 388 A.2d 461 (D.C. 1978), a case involving a customer's aggressive behavior toward a waitress in a restaurant, and ultimately the customer's reach over the counter toward the cash register and a demand for money. The central issue relating to the customer's robbery conviction was whether the trial court erred by failing to give a requested instruction about larceny as a lesser-included offense of robbery. *Id*. at 463. This court declared that the trial court "correctly concluded that a lesser offense instruction was not warranted as larceny (rather than robbery) was not fairly inferable from the evidence," and we also noted that "the government [was not] relieved of its burden of proving that the victim was put in fear by the defendant at the time of the robbery," as opposed to the period "before the robber approached." *Id*. at 464.

(…continued)
Chau's difficulty with English and his inability to precisely understand the prosecutor's questions likely meant that the jury did not place significant weight on his testimony that appellants *only* said "what, what, what" to him." We cannot say that either of these government assumptions constitutes reasonable inferences on this record.

However, there are at least a few other cases in other jurisdictions revealing the type of proof that satisfied the fear or intimidation element of robbery. In *Parnell*, *supra*, 389 P.2d 372, appellants had agreed to do repair work in the attic of the eighty-four year-old victim's house for $25. On the day of the repairs the victim was alone in the house. Two of the appellants proceeded to the attic to work and the third stayed in the dining room. When the repairs were completed one of the appellants informed the victim that the bill amounted to $600.00. The victim testified that she was frightened, that one man was on one side of her and another on the other side, between her and the door. She gave one of the appellants $300.00, and in response to his question as to when she could pay the rest, the victim suggested that maybe she could go to the store and cash a check. The men left. One of the victim's neighbors testified at trial that she saw the victim shortly after the men left and she "appeared to be frightened." *Id*. at 374. The jury returned a verdict of guilty on the charge of robbery by fear. The appellate court held that "the evidence was wholly insufficient to support the verdict of the [j]ury," because there was insufficient proof of the fear or intimidation element. *Id*. at 375. The court declared, "Where a person parts with money upon a mere demand made in a rough, positive voice, with an oath, the taking is not robbery; the menace not being such as to excite reasonable apprehension of danger." *Id*. at 374.

*Spencer v. State*, 30 A.3d 891 (Md. 2011), on which Mr. Williams and Ms. Norman rely, involved a robbery at an automobile service center. Appellant walked into the center one afternoon and without pointing anything or implying anything, told the person at the cash register, "Don't say nothing." The cashier handed the cash register drawer to appellant because he "wasn't taking no chances." *Id*. at 893-94. The court held that "the State failed to prove an essential element of the crime of robbery" because "[t]here was no evidence that [petitioner] conducted himself in a manner that could cause apprehension in a reasonable person that the petitioner was about to apply force." *Id*. at 893. "[N]o note was handed to the cashier, no demand for money was made, and no reference to money or the cash register was made by the petitioner." *Id*. at 899.

In both *Parnell* and *Spencer* the court focused on the conduct and words of the appellant and the petitioner in concluding that the evidence was insufficient to prove the fear or intimidation element.[13] Here, viewed in the light most favorable to the

---

[13] We are aware that in some financial institution or bank robbery cases, courts have said that "intimidation generally may be established based on nothing more than a defendant's written or verbal demands to a teller. . . ." *Ketchum*, *supra*, 550 F.3d at 367 (citation omitted). But in these types of cases courts generally require "unequivocal written and verbal demands for money to bank employees." *Gilmore*, *supra*, 282 F.3d at 403.

government and within the "beyond a reasonable doubt" standard, the government's evidence establishes that three young people walked by Mr. Chau, turned around and walked back to him. Two of the young people said, "what, what, what," while the third was quiet or "observing the scenery" or "looking around." Mr. Chau handed his wallet to one of the young people. This evidence did not prove "menacing conduct" that would "engender fear," *Parks*, *supra*, 627 A.2d at 5, or "some threatening act that would lead a reasonable person to believe he was in imminent danger of bodily harm." *In re D.R.*, *supra*, 96 A.3d at 47 n.2 (citation omitted). In sum, we hold that on this record, the government failed to prove the element of "violence or putting [a person] in fear."

Accordingly, for the foregoing reasons, we reverse appellants' robbery convictions.[14]

*So ordered.*

---

[14] Because the government must prove all of the elements of the crime beyond a reasonable doubt, *Rivas*, *supra*, 783 A.2d at 134, and because we hold that the government did not satisfy its burden in this case, Mr. Bullock gets the benefit of our ruling on Mr. Williams's and Ms. Norman's challenge to the sufficiency of the evidence on the robbery charge.

FISHER, *Associate Judge*, concurring in the judgment:    There is no doubt that Mr. Chau surrendered his wallet to appellants because he feared them.    But due to a language barrier, and perhaps nervousness, he was unable to clearly explain what appellants had done to engender that fear or to communicate that this was a robbery. I therefore reluctantly agree that "the government failed to prove the element of 'violence or putting [a person] in fear.'"    Opinion for the court at 23.

Of course, appellants did not give the wallet back or try to explain that Mr. Chau had misunderstood the situation.    Instead, they walked away together with the wallet, rifling through it in search of valuables, and one of them kept Mr. Chau's Metro card.    However, the government has not asked us to enter judgment on a lesser-included offense.    For these reasons, I concur in the judgment.