*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-481

TERELL A. KELLY, APPELLANT,

v.

UNITED STATES, APPELLEE.

On Appeal from the Superior Court
of the District of Columbia
(CF3-16351-18)

(Hon. J. Michael Ryan, Trial Judge)

(Argued April 27, 2022                    Decided September 1, 2022)

*Mindy Daniels* for appellant.

*William Collins*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the briefs, as *amicus curiae* supporting appellant.

*Kristina L. Ament*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *Timothy J. Shea*, United States Attorney at the time the opening brief was filed, and *Chrisellen R. Kolb*, *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Bryan Han*, and *T. Patrick Martin*, Assistant United States Attorneys, were on the briefs, for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and FISHER, *Senior Judge*.

MCLEESE, *Associate Judge*: Appellant Terell A. Kelly was convicted of robbery. Mr. Kelly argues that (1) the trial court erroneously denied Mr. Kelly's

motion to suppress evidence obtained as a result of an unlawful search; (2) the evidence was insufficient to support the conviction; and (3) the trial court erroneously refused to permit the jury to decide whether the robbery occurred in the District of Columbia. We affirm.

## I. Factual Background

In brief, the evidence at trial was as follows. Jordan Tyler got on a Metro train at the Southern Avenue Metro Station in Maryland. Mr. Tyler took a window seat. Soon thereafter, Mr. Kelly sat next to Mr. Tyler and asked, "You know me?" Mr. Tyler, who did not know Mr. Kelly, responded, "no bro." Mr. Kelly said, "I'm not your bro," and asked for Mr. Tyler's cell phone. Mr. Tyler noticed that Mr. Kelly had a gun under his leg. Mr. Tyler handed his cell phone to Mr. Kelly. Mr. Kelly asked Mr. Tyler for other items, including his headphones, his book bag, and his shoes, which were white and blue Jordan Retro 8s with pink laces. Mr. Tyler handed over those items. Mr. Tyler did not ask for help, because he did not "want to make any movements that would cost [his] life." Mr. Tyler did not willingly give Mr. Kelly his possessions. This encounter took place while the train was moving from the Southern Avenue Metro Station in Maryland to the Congress Heights Metro Station in the District of Columbia.

Metro surveillance cameras captured the incident, and the jury viewed video footage of the incident. A weapon was not visible in the video footage.

Mr. Kelly and his girlfriend Jamilla Salahuddin got off the train at the Congress Heights Metro Station. Mr. Kelly was carrying a backpack that Ms. Salahuddin did not recognize. While Mr. Kelly and Ms. Salahuddin were riding a bus home, Mr. Kelly opened the backpack and gave Mr. Tyler's shoes to Ms. Salahuddin. Mr. Kelly then threw the backpack into a trash can.

After the incident was reported, a Metro Transit Police detective used video surveillance footage to determine when and where Mr. Kelly entered the Metro system before the incident and left the system after the incident. Based on that information, the detective determined the serial number of the SmarTrip card Mr. Kelly used to pay his fare. The detective set up an email alert so that the police would be notified each time that SmarTrip card was used.

The day after the incident, police used an email alert to locate Mr. Kelly and Ms. Salahuddin at the Gallery Place Metro Station. Ms. Salahuddin was wearing Mr. Tyler's shoes. An officer seized the shoes and took photos of Mr. Kelly and

Ms. Salahuddin, but the officer did not make an arrest at that time. The police arrested Mr. Kelly a few days later. Mr. Kelly had the SmarTrip card on his person when he was arrested.

A jury found Mr. Kelly guilty of robbery but acquitted him of weapon offenses.

## II. Motion to Suppress Evidence

Mr. Kelly argues that the police unlawfully searched and tracked Mr. Kelly's Metro SmarTrip card. We disagree.

### A. Procedural and Factual Background

Mr. Kelly filed a pretrial motion to suppress evidence, arguing that the police had unlawfully searched and tracked his Metro SmarTrip card. The United States argued that the police's use of information about Mr. Kelly's SmarTrip card did not constitute a search within the meaning of the Fourth Amendment. *See* U.S. Const. Amend. IV (prohibiting "unreasonable searches and seizures").

The trial court held an evidentiary hearing on the motion. In brief, the evidence at the hearing was as follows. A SmarTrip card transmits information about the time and location of entry and exit from stations. The card will transmit that information only when the card is within two inches of a card reader. Otherwise, the card does not transmit information. WMATA uses information from SmarTrip cards to keep track of customers' accounts. SmarTrip cards state that cardholders must produce the card if requested by an authorized employee or the police.

WMATA keeps a "tracking list" for SmarTrip cards of interest to WMATA's investigative unit. If a card is placed on that list, then WMATA personnel are automatically notified of the date, time, and station of use. That information is transmitted every thirty minutes, when WMATA's mainframe computer sends out email alerts. Mr. Kelly's SmarTrip card was put on this list on the date of the incident, and information from the tracking list was used to locate Mr. Kelly and stop him the next day at the Gallery Place Metro Station. In general, card numbers stay on the tracking list until the person holding the card is identified, after which the card number is removed from the tracking list within twelve hours.

The trial court denied the motion to suppress, concluding that the police's use of information about Mr. Kelly's SmarTrip card was not a search.

## B. Analysis

"Government conduct is a search within the meaning of the Fourth Amendment if it invades an actual (subjective) expectation of privacy that society is prepared to recognize as reasonable." *Jones v. United States*, 168 A.3d 703, 711 (D.C. 2017) (ellipses and internal quotation marks omitted). We hold that the police conduct in this case was not a search.

In this case, the police used information generated and maintained by Metro for business purposes, and the police's use of that information provided relatively limited information: for a period of two days, where and when Mr. Kelly entered and left Metro stations. Decisions of the Supreme Court and other courts indicate that such conduct does not amount to a search, because such conduct does not invade a reasonable expectation of privacy. The most directly relevant case is *Commonwealth v. Henley*, 171 N.E.3d 1085 (Mass. 2021). In *Henley*, the police physically seized a suspect's "CharlieCard" (a card, similar to a SmarTrip card, issued by the Massachusetts Bay Transportation Authority (MBTA)). *Id.* at 1095 n.2, 1101. The police then used the number on the card to determine, from records kept by the MBTA, the suspect's use of the MBTA system on two specific dates. *Id.* at 1101-02, 1105-06. The court held that, given the short time period and limited

data involved, the police's use of MBTA records did not amount to a search. *Id.* at 1106-07.

In *United States v. Knotts*, 460 U.S. 276 (1983), the Supreme Court of the United States held that it was not a search (1) to place a beeper inside a container that was transported by car; and (2) over the course of a trip from Minnesota to Wisconsin, to use the beeper to track the travels of the container primarily on public roads but also onto private property. *Id.* at 277-78, 281-82. The Court explained that a "person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in [the person's] movements from one place to another." *Id.* at 281. The Court noted, however, that if such surveillance expanded into "dragnet type law enforcement practices . . . different constitutional principles may be applicable." *Id.* at 284.

In our view, the present case fits comfortably with *Henley* and *Knotts*. The police apparently received very limited information about Mr. Kelly's SmarTrip card, over a period of two days. During that time, the police received email notifications informing the police when Mr. Kelly used the card to enter or leave a Metro station. The notifications simply provided sporadic information about Mr. Kelly's location in a public place at particular moments. They did not permit Mr.

Kelly's precise movements to be continuously monitored in real time. We therefore hold that the police's use of the information at issue in this case did not amount to a search.

We are not persuaded by Mr. Kelly's reliance on *Carpenter v. United States*, 138 S. Ct. 2206 (2018), and *Jones*, 168 A.3d at 711-12. In *Carpenter*, the Supreme Court held that it was a search for the police to access seven days' worth of a suspect's cell-phone location information. 138 S. Ct. at 2213-20, 2217 n.3. As the Supreme Court explained, such information "tracks nearly exactly the movements" of the cell phone's owner. *Id.* at 2218. Such data thereby "provides an intimate window into a person's life, revealing not only [the person's] particular movements, but through them [the person's] familial, political, professional, religious, and sexual associations." *Id.* at 2217 (internal quotation marks omitted). In concluding that a search occurred in *Carpenter*, the Supreme Court explicitly distinguished cell-phone location information from the more limited information available through the "rudimentary tracking" that had occurred in *Knotts*. *Carpenter*, 138 S. Ct. at 2215, 2219-20. We view this case as far more comparable to *Knotts* than to *Carpenter*.

*Jones* involved the use of a cell-site simulator. 168 A.3d at 708-10. That device can identify the signal of a particular cell phone, mimic a cell-phone tower,

cause the cell phone to communicate with the simulator, and thereby determine the precise location of the cell phone. *Id.* at 709-10. This court held that the use of such a device was a Fourth Amendment search, for several reasons. *Id.* at 711-17. First, locating and tracking the movements of people's cell phones "has the substantial potential to expose the owner's intimate personal information." *Id.* at 711. Second, cell-site simulators allow the police "to discover [a] person's precise location remotely and at will." *Id.* at 713. Third, cell-site simulators obtain information by "exploit[ing] a security flaw" of cell phones. *Id.* at 714. The court in *Jones* explicitly noted, however, that "certain forms of tracking do not invade a reasonable expectation of privacy." *Id.* at 713. The court specifically cited *Knotts* for the proposition that "use of an electronic device to track a suspect's movements in public spaces did not invade a reasonable expectation of privacy." *Id*. Essentially for the reasons we have already stated, we conclude that the limited and sporadic information at issue in this case is far more comparable to the information at issue in *Knotts* than to the cell-site simulator information at issue in *Jones*.

In sum, we hold that the police's use of information about Mr. Kelly's SmarTrip card did not amount to a search within the meaning of the Fourth Amendment. We therefore uphold the trial court's denial of the motion to suppress evidence.

### III. Sufficiency of the Evidence

Mr. Kelly argues that the evidence was insufficient to prove beyond a reasonable doubt that he used force or violence to take property by putting Mr. Tyler in fear. We hold that the evidence was sufficient on this point.

"When assessing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Roberts v. United States*, 216 A.3d 870, 882 (D.C. 2019) (internal quotation marks omitted). "The evidence is sufficient if, after viewing it in the light most favorable to the verdict, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

Robbery can be committed by putting the victim in fear. *See* D.C. Code § 22-2801 ("Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery . . . ."). "The test is not whether the victim experienced actual fear or had a subjective perception of fear, but whether the assailant acted in such a manner as

would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Williams v. United States*, 113 A.3d 554, 561 (D.C. 2015) (ellipses and internal quotation marks omitted).

Mr. Tyler testified that someone he did not know and who was armed with a gun sat next to him and started asking for his belongings, including valuable items such as a cell phone. Mr. Tyler testified that he handed over his belongings unwillingly and that he did not ask for help because he was afraid to make movements that might cost him his life. That testimony amply supported the robbery verdict. *See, e.g.*, *Bean v. United States*, 409 A.2d 1064, 1065, 1067 (D.C. 1979) (evidence that defendant pointed gun at victim and demanded money "clearly sufficed" to support robbery conviction).

We are not persuaded by Mr. Kelly's arguments to the contrary. First, Mr. Kelly points out that the jury acquitted him of all weapon charges. Under our case law, however, that is irrelevant to whether the evidence was sufficient to support the robbery conviction. *See, e.g.*, *Jones v. United States*, 716 A.2d 160, 164 (D.C. 1998) ("So long as the evidence was sufficient to support the conviction in question, the fact that the jury acquitted the appellant of certain related counts does not invalidate the conviction."); *Steadman v. United States*, 358 A.2d 329, 332 (D.C. 1976) ("The

law correctly recognizes that it must make room for jurors' negotiation and compromise during deliberation. Therefore, a jury verdict need not be logically consistent. The only question for review is whether the evidence was sufficient to support the conviction under the guilty verdict.").

Second, Mr. Kelly relies on *Williams*, 113 A.3d at 555-64, where we held that there was insufficient evidence that the complainant had been put in fear. In our view, this case is quite different from *Williams*. In *Williams*, the defendants walked toward the complainant at night; the complainant thought that they might have had weapons but did not see any weapons; the complainant testified that the defendants "did not threaten him or make him afraid"; and the defendants did not explicitly demand the complainant's wallet or money, instead saying only "what, what, what." *Id.* at 556, 561-63. In contrast, Mr. Tyler testified that Mr. Kelly had a gun, that Mr. Kelly asked for specific valuable items, and that Mr. Tyler feared for his life and did not give up the items willingly.

Finally, Mr. Kelly points out that Mr. Tyler was impeached in various respects at trial. Mr. Tyler's testimony was also corroborated in various respects, however, including by surveillance video. In any event, we are required to give "full play to

the right of the fact-finder to determine credibility." *Roberts*, 216 A.3d at 882. We see no basis to overturn the jury's verdict on this ground.

## IV. Geographic Jurisdiction

In the trial court, Mr. Kelly argued that the trial court lacked jurisdiction because the robbery occurred in Maryland rather than the District of Columbia. Relatedly, Mr. Kelly argued that the issue of jurisdiction should be decided by the jury rather than the trial court. The trial court disagreed on both points. Mr. Kelly renews his arguments in this court. We need not resolve those arguments, because we hold that any error by the trial court was obviously harmless beyond a reasonable doubt.

It is undisputed that the trial court had jurisdiction if the robbery involved a criminal act committed in the District of Columbia. *See, e.g.*, *Tornero v. United States*, 161 A.3d 675, 687-88 (D.C. 2017) (holding that Superior Court has jurisdiction over criminal acts committed in District of Columbia). Even if we assume that the robbery took place entirely in Maryland, however, the trial court plainly had jurisdiction in this case. There is no dispute that Mr. Kelly got off the Metro train in the District of Columbia, carrying with him some of Mr. Tyler's

belongings.  If the robbery occurred in Maryland, the District of Columbia had jurisdiction under D.C. Code § 22-1808, which provides:

> Any person who by the commission outside of the District of Columbia of any act which, if committed within the District of Columbia, would be a criminal offense under the laws of said District, thereby obtains any property . . . , and . . . who brings any such property . . . into said District, shall, upon conviction, be punished in the same manner as if said act had been committed wholly within said District.

Mr. Kelly does not challenge the validity of § 22-1808, and he has not provided any basis upon which jurisdiction could properly be found lacking given the jury's finding of guilt and the undisputed facts of the case.  We therefore conclude that the District of Columbia had jurisdiction over the robbery charge in this case.

Mr. Kelly argues, however, that the jurisdictional issue should have been submitted to the jury.  In support of that argument, Mr. Kelly relies on a line of cases including *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (defendants have constitutional right to jury determination "of every fact necessary to constitute the crime with which [they are] charged") (internal quotation marks omitted).  The United States argues in response that *Apprendi* is not applicable to the jurisdictional issue in this case, relying among other things on this court's decision in *Adair v.*

*United States*, 391 A.2d 288, 290 (D.C. 1978) (issue of geographic jurisdiction was properly decided by court rather than jury). We conclude that any error in failing to submit the issue of geographic jurisdiction to the jury was obviously harmless beyond a reasonable doubt.

We assume for current purposes, without deciding, that the issue of geographic jurisdiction should have been treated as, in effect, an element of the robbery offense, so that Mr. Kelly had a constitutional right to have the jury decide that issue. The failure to instruct the jury on an essential element, however, is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999) (internal quotation marks omitted). The jury in this case found Mr. Kelly guilty of committing the robbery. As we have explained, the conclusion that the Superior Court had geographic jurisdiction in this case follows as a matter of law from that verdict and facts that were neither disputed nor reasonably disputable: either the robbery occurred in the District or the robbery occurred in Maryland and Mr. Kelly brought the proceeds of the robbery into the District. We therefore hold that the failure to submit the issue of geographic jurisdiction to the jury was harmless beyond a reasonable doubt.

The United States did not initially argue that any error was harmless, instead addressing that issue only after this court directed supplemental briefing. "[I]t is only in the rare circumstance in which harmlessness is obvious that we are prepared to find an error harmless notwithstanding the government's failure to make a timely claim of harmlessness." *Randolph v. United States*, 882 A.2d 210, 226 (D.C. 2005). For the reasons we have stated, we conclude that any error in failing to submit the issue of geographic jurisdiction to the jury was obviously harmless beyond a reasonable doubt.

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed*.