*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 17-CF-1204 & 21-CO-89


STEVEN M. BAILEY, APPELLANT

V.

UNITED STATES, APPELLEE.


Appeals from the Superior Court
of the District of Columbia
(CF3-3986-16)

(Hon. Marisa J. Demeo, Trial Judge)

(Submitted December 2, 2019                      Decided August 19, 2021)

*Mindy Daniels* was on the brief for appellant.

*Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Rizwan Qureshi*, and *Bryan H. Han*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN, THOMPSON, and EASTERLY, *Associate Judges*.

Opinion for the court by *Associate Judge* EASTERLY.

Opinion by *Associate Judge* GLICKMAN, pursuant to Part II.D., at page 25.

Opinion by *Associate Judge* THOMPSON, pursuant to Part II.D. and dissenting from Part II.B., at page 35.

Opinion by *Associate Judge* EASTERLY, dissenting from Part II.D., at page 41.

EASTERLY, *Associate Judge*:  Appellant Steven Bailey was convicted of one count of conspiracy to commit a crime of violence (robbery), one count of robbery with a sentence enhancement for being armed or having a dangerous weapon readily available, two counts of assault with a dangerous weapon ("ADW"), and three counts of possession of a firearm during a crime of violence ("PFCV").  On appeal, he challenges the sufficiency of the evidence to support all of his convictions and also argues certain of his convictions should be merged.  For the reasons set forth in Part II.B., a majority of the division reverses Mr. Bailey's conviction for conspiracy to commit a crime of violence and remands with instructions to enter in its place a judgment of guilt for conspiracy to commit a nonviolent criminal offense.  For the reasons set forth in Part II.C., the division unanimously reverses Mr. Bailey's convictions for ADW and PFCV and the "while armed" sentencing enhancement of his robbery conviction.  And as noted in Part II.D., for the reasons set forth in the separate opinions of two members of the division, the division affirms Mr. Bailey's conviction for robbery.  Given this resolution, we need not address Mr. Bailey's merger arguments.

## I. Facts and Procedural History

The government's first attempt to convict Mr. Bailey ended with a mistrial when the jury was unable to reach a verdict. The factual narrative below is based on the testimony and evidence presented at Mr. Bailey's retrial.

Mr. Bailey initially made contact with complainant Rashida Reid through OfferUp, a mobile device app that connects buyers and sellers. Ms. Reid was selling a limited commodity item, a pair of Nike Air Jordan 11 basketball shoes, that Mr. Bailey expressed an interest in purchasing for $325. They arranged to meet in the early afternoon at a location in a residential area of southeast D.C. selected by Mr. Bailey. Ms. Reid drove to the meeting place with her friend, Alexus Jones. While she drove, Ms. Reid talked to Mr. Bailey on the phone, and when she reached the location she could see him speaking to her. Mr. Bailey was standing with two other men—Mr. Bailey's brother, Zackary Jackson, and a third man who was never identified. After Mr. Bailey's phone call with Ms. Reid ended, Mr. Bailey turned to talk to one of the other men,[1] pulled money out of his pocket, and gestured toward Ms. Reid as if he did not have enough money to pay her. (Ms. Jones recalled that

---

[1] Ms. Reid testified that this was the unidentified man, whereas Ms. Jones testified that this was Mr. Jackson.

she heard Mr. Bailey say aloud, "I need the money.")  Mr. Bailey and the man he was speaking to "exchanged" something that both Ms. Reid and Ms. Jones thought "was money," and Mr. Bailey "placed it in his back pocket."

Mr. Bailey walked up to the driver side of Ms. Reid's car, and he and Ms. Reid spoke through the rolled down window.  Ms. Reid testified that Mr. Bailey "calm[ly]" asked to see the shoes to confirm they were authentic, while Ms. Jones testified that Ms. Reid offered to show him the shoes.  Ms. Reid placed the matchbox-design shoebox in her lap and removed its outer sleeve.  According to Ms. Reid, Mr. Bailey observed the shoes "[f]or about a second or two" and told her they looked real.  Then, in an "almost simultaneous" exchange, he "snatche[d] the box" from Ms. Reid and "thr[ew] the money on to [her] lap."[2]  He "walk[ed] off pretty fast," with the shoes in the box, but without the sleeve, and did not return.[3]

---

[2] Ms. Reid saw Mr. Bailey pull the money from his back pocket.

[3] Ms. Jones corroborated that Ms. Reid had displayed the shoes to Mr. Bailey, but her narrative differed in that she recalled that Mr. Bailey and Ms. Reid had then briefly discussed the price.  Ms. Jones also described a quick exchange in which Ms. Reid "lifted the box," Mr. Bailey "grabb[ed] it to take it" from Ms. Reid, and "he then dropped the money in [Ms. Reid's] lap."  Ms. Jones further recalled that Ms. Reid had then called out to ask whether Mr. Bailey wanted the sleeve, and that Mr. Bailey had returned to the car to retrieve it and walked away again.

The money Mr. Bailey gave Ms. Reid as payment was counterfeit. According to the government's expert, the quality was "good"; to "an individual who is not trained to know what to look for," the bills would have "appear[ed] as though[] they [we]re genuine." But as it happened, Ms. Reid and Ms. Jones had the requisite training, both having worked as revenue auditors for a casino. According to Ms. Reid, she immediately realized that the money was "fake."[4]

Ms. Reid called out to Mr. Bailey that the money was fake. Mr. Bailey, who by this time was some distance from the car, responded that the money was not fake and continued to walk away while Ms. Reid drove slowly after him. According to Ms. Reid, Mr. Bailey and the two other men "started saying 'roll out,'" which she understood as a directive to her and Ms. Jones to "leave." Although Ms. Jones only recalled hearing the two other men yell "roll out," she also interpreted this as the men "telling [the women] that [they] needed to leave." Both women observed Mr. Bailey walking faster than the other two men such that they were behind him, Ms. Jones estimated, by a distance that expanded from six feet to ten-to-twelve feet. Ms. Reid then saw the unidentified man, who had stopped walking and was "just

---

[4] Ms. Jones testified, however, that Ms. Reid first asked her if she thought the money was fake. Ms. Jones initially rejected that possibility, but after feeling the thickness of the money and holding "a few of the 20s up to the light to see if the money line was there," she determined that it was in fact counterfeit.

stand[ing]" and looking at her. The man was moving his hand in his pocket, which Ms. Reid interpreted as a threatening message to her that he had a gun. Ms. Reid decided that continuing to follow the men was "not worth it." As Ms. Reid turned the corner to drive away, Ms. Jones looked through the back windshield and saw the unidentified man step behind their car, pull a silver gun from his waistline, and point it at them. Ms. Jones explained that at this point Mr. Bailey was ahead of the car on the left side while the two other men were behind the car. Ms. Jones yelled "gun," and, although Ms. Reid did not see the gun herself, she "floored it" to get away.

Ms. Reid and Ms. Jones immediately reported the incident to police officers they encountered down the street. A few days later, the Gun Recovery Unit of the Metropolitan Police Department encountered a group of young men including Mr. Jackson. When he tried to run away, the police chased and caught him. The police recovered a silver revolver in the vicinity of his flight path, prompting his arrest.[5] Pursuant to his arrest, the police seized Mr. Jackson's cell phone, from which they extracted a group text chat between Mr. Bailey, Mr. Jackson, and several other

---

[5] Although the jury heard testimony that Mr. Jackson was arrested for gun possession, the government told the jury in closing that the government "would not ask [it] to reach a conclusion that [the revolver that was found on Mr. Jackson was] the exact same gun" that the unidentified man pointed at Ms. Reid and Ms. Jones, because the government "ha[d not] presented . . . any evidence of that" and "c[ould not] prove that."

individuals. In the days leading up to his encounter with Ms. Reid, Mr. Bailey and his friends expressed their desire to buy Jordan 11 shoes, either by getting lottery tickets allowing them to purchase the shoes from a retail store or by buying the shoes from "a plug," i.e., "a person who can get you what you want." On the morning of the incident, after Mr. Bailey had arranged his meeting with Ms. Reid through OfferUp, he told the text group, "I am about to meet the bitch for mines. I am going to jug her sweet ass."[6] Another member of the chat responded that the seller would "tell [the police]" what Mr. Bailey looked like. Mr. Bailey concluded the exchange with a profanity. Later that day, Mr. Bailey sent to the text group a picture of the Jordan 11 shoes with the caption, "Gang shit . . . ."

After hearing this evidence, the jury at Mr. Bailey's second trial found him guilty of one count of conspiracy to commit robbery, one count of robbery while armed, two counts of assault with a dangerous weapon, and three counts of possession of a firearm during a crime of violence. This appeal followed.

---

[6] The detective who described the texts in court testified that "jug" meant "to get somebody, to rob somebody . . . from [his] experience" as a law enforcement officer and from "growing up in DC."

Mr. Bailey subsequently moved in the trial court for compassionate release. *See* D.C. Code § 24-403.04 (2012 Repl. & 2021 Supp.). The trial court issued an indicative order pursuant to Superior Court Rule of Criminal Procedure 37, stating its intent to grant the motion upon remand from this court. We remanded the case on Mr. Bailey's unopposed motion, whereupon the trial court altered Mr. Bailey's sentence, and Mr. Bailey filed a new notice of appeal and moved to reinstate this appeal. We granted the motion and consolidated the appeals.

## II. Analysis

The government argued at trial that Mr. Bailey did "more than commit[] a robbery"; "[h]e conspired to commit a robbery while armed." And because he was a member of such a conspiracy, he was criminally liable for the reasonably foreseeable weapon-related offenses of his co-conspirators. Analyzing Mr. Bailey's challenge to the sufficiency of the evidence to support these convictions, we conclude that the government only proved beyond a reasonable doubt Mr. Bailey's guilt of (1) conspiracy to commit theft by deception and (2) robbery.

## A. Standard of Review

"We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to sustaining the judgment, and making no distinction between direct and circumstantial evidence." *Fitzgerald v. United States*, 228 A.3d 429, 436 (D.C. 2020) (citations, brackets, and internal quotation marks omitted). When the evidence, viewed in this manner, "is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime, then the evidence is insufficient and we must say so." *Williams v. United States*, 113 A.3d 554, 560 (D.C. 2015) (internal quotation marks omitted).

Although "the government's evidence need not negate every possible inference of innocence to support a guilty verdict," *Campos-Alvarez v. United States*, 16 A.3d 954, 964 (D.C. 2011), "[t]he evidence must support an inference, rather than mere speculation, as to each element of an offense." *Lewis v. United States*, 767 A.2d 219, 222 (D.C. 2001) (internal quotation marks omitted); *see also Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) ("[W]hile a jury is entitled to draw a vast range of reasonable inferences from evidence, it may not base a verdict on mere speculation." (brackets and internal quotation marks omitted)); *Williams*, 113 A.3d at 560 (evidence is insufficient "if, in order to convict, the jury is required

to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation" (internal quotation marks omitted)).  Relatedly, "slight evidence is not sufficient evidence," and "a mere modicum cannot rationally support a conviction beyond a reasonable doubt."  *Russell v. United States*, 65 A.3d 1172, 1176 (D.C. 2013) (brackets and internal quotation marks omitted).

**B.  The Conviction for Conspiracy to Commit a Crime of Violence (Robbery)**

Mr. Bailey does not contest that he sought to illegally obtain a pair of Jordan 11s from Ms. Reid by purchasing them with counterfeit money.  He argues, however, that the evidence establishing this conduct is not legally sufficient to support his conviction for conspiracy to commit a crime of violence, D.C. Code § 22-1805a(a)(2) (2012 Repl. & 2021 Supp.); § 23-1331(4) (2012 Repl. & 2021 Supp.), specifically robbery, D.C. Code § 22-2801 (2012 Repl. & 2021 Supp.), or robbery while armed, D.C. Code § 22-2801; § 22-4502(a) (2012 Repl. & 2021 Supp.).  We agree.

1. *Insufficiency*

"To establish the existence of a conspiracy, the government must prove (1) an agreement between two or more persons to commit a criminal offense; (2) knowing participation in that agreement with intent to commit the criminal objective; and (3) during the life of the conspiracy, and in furtherance of its objective, the commission by at least one conspirator of at least one of the overt acts specified in the indictment." *Harrison v. United States*, 76 A.3d 826, 842 (D.C. 2013) (internal quotation marks omitted). "The formation of a conspiracy to rob does not necessarily require agreement either as to the means of committing the robbery, or as to the particular person to be robbed." *Collins v. United States*, 73 A.3d 974, 983 (D.C. 2013) (internal quotation marks omitted). But the formation of a conspiracy to rob certainly does require an agreement to actually rob another person. *See id.* (allowing for some "room for improvisation or refinement of details so long as [the conspirators] have agreed upon their fundamental goal"); *see also* 2 Wayne R. LaFave, *Substantive Criminal Law* § 12.2(c)(2) n.112 (3d ed. 2017) (noting that the intent for conspiracy "need not be so particular that the conspirator has in mind a particular time, place, victim, etc., but at least must relate to a particular type of criminal activity"). Without conceding that the record contains evidence of *any* sort of conspiracy, Mr. Bailey argues that there is insufficient evidence of an agreement

to commit a robbery, which, beyond requiring proof that property was wrongfully obtained (also an element of the crime of theft[7]), requires that the defendant execute such a taking by specific and more culpable means: "by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting [the victim] in fear."[8]

To determine if there was a plan to rob Ms. Reid of the Jordan 11s, we look first to the government's evidence of Mr. Bailey's text exchanges prior to his meeting with Ms. Reid. Mr. Bailey sent his texts to a group of people that included at least one of the two men who was with Mr. Bailey on the date of the incident— his brother Mr. Jackson. (Because the second man, the one who displayed a weapon, was never identified, it is unknown if he was part of the group text.) In his texts, Mr. Bailey expressed interest in obtaining a pair of Jordan 11s, informed the group that he had set up a meeting with an individual who was selling them, and announced

---

[7] *See* D.C. Code § 22-3211(a) (2012 Repl. & 2021 Supp.) (defining the "wrongfully obtains or uses" element of the crime of theft to include "(1) taking or exercising control over property[] . . . or (3) obtaining property by trick, false pretense, false token, tampering, or deception").

[8] D.C. Code § 22-2801; *see also Gray v. United States*, 155 A.3d 377, 382 (D.C. 2017) (explaining that "[p]roof of robbery requires proof of the elements of theft plus several aggravating circumstances," including that the taking be "accomplished using force or violence" as defined by the statute (internal quotation marks omitted)).

his intention to "jug" her. The government further presented evidence from a detective that, in his personal experience, he understood the word "jug" to mean "rob." But this one individual's testimony of his personal understanding of a slang term alone does not constitute sufficient proof that Mr. Bailey intended to engage in the crime of robbery as defined by the D.C. Code and this court.[9] The word "rob" itself has a number of meanings and in common parlance may be used interchangeably with "steal."[10] Nothing about the context in which Mr. Bailey used the word "jug" shed light on the meaning he intended. It was clear he intended to obtain the shoes by breaking the law—prompting one of the members of the text group to tease that the seller would note a distinctive feature of his appearance and report him to the police—but he was nonspecific as to how he would do so. Additionally, the text communications from Mr. Bailey neither invited or resulted in offers of assistance nor provided any particular details of the time or location of Mr.

---

[9] *See United States v. McGill*, 487 F.2d 1208, 1209–10 (D.C. Cir. 1973) (holding that evidence was insufficient to convict defendant of robbery based only on complainant's report to the police that he had been "robbed," where the government proved that the complainant had a sum of money and other packages in his possession and that the defendant held him up at gunpoint and searched his pockets, but presented no evidence that the defendant actually took any of the complainant's possessions).

[10] *See Rob*, *Webster's Third New International Dictionary* (3d ed. 2002) (defining "rob" to mean not only "to take something away from (a person) by force," but also to "steal from" or "deprive of something due").

Bailey's meeting with the prospective buyer to facilitate such assistance.[11]  In short, the texts admitted at trial support only a conclusion that Mr. Bailey intended to engage in some form of criminal activity, alone, to obtain the shoes.

The lack of an express or inferable agreement to commit a robbery in Mr. Bailey's text exchange with other individuals prior to his encounter with Ms. Reid is not dispositive.  "[A] jury may infer the existence of an agreement from the participants' actions, including the conduct of defendants in mutually carrying out a common illegal purpose[] [and] the nature of the act done . . . ."  *Collins*, 73 A.3d at 982 (brackets, citations, and internal quotation marks omitted).  Thus we examine what actually transpired when Mr. Bailey met Ms. Reid to make the arranged purchase.

---

[11] The government highlights that Mr. Bailey sent a photograph of the shoes to the group text after the fact, with the caption, "gang shit . . ."  and notes the detective's testimony that a "gang" is "[a] group of people . . . that get together to commit crimes."  Be that as it may, there is no indication that Mr. Bailey was using the word "gang" to refer to the people in the text group, much less that he was implicating them in a criminal association to commit robberies.  The government did not otherwise present evidence of membership in such a "gang."  In light of this, we agree with Mr. Bailey that it would be speculative to conclude that Mr. Bailey's use of the words "gang shit" in a text is evidence that he conspired to commit a robbery with gang members; instead, it appears "gang shit" was simply a descriptor of the shoes which Mr. Bailey was showing off to the group text.

Just prior to the purchase, Mr. Bailey was in the company of Mr. Jackson and the unidentified man. At Mr. Bailey's request, one of the men gave Mr. Bailey something that appeared to be money, Mr. Bailey put that money in his back pocket, and he retrieved the counterfeit money from that same location when he paid Ms. Reid. This counterfeit money was "good" fake money, apparently meant to deceive the seller and induce a voluntary sale.[12] And he made the exchange of money for shoes quickly, giving himself more time to get away before Ms. Reid could examine the money closely. The jury could reasonably infer from this evidence that one of Mr. Bailey's companions provided him with some or all of the counterfeit money, and that Mr. Bailey, having already indicated a willingness in the group text to break the law, knew the money was counterfeit. But because the only agreement that can be discerned from this evidence beyond a reasonable doubt was one for Mr. Bailey to use counterfeit money to engage in a fraudulent purchase of the Jordan 11s, the only conspiracy it sufficiently supports is a conspiracy to commit the crime of theft by deception. *See Gray*, 155 A.3d at 381 (explaining "it is well-established that second-degree theft is a lesser included offense of robbery").

---

[12] Even though both women had the training to identify counterfeit bills, Ms. Jones did not initially perceive the money to be fake, and had to touch it and hold it up to the light to discern that it was counterfeit.

The government argues, however, that the record is sufficient to establish that Mr. Bailey conspired to rob Ms. Reid, because of the precise manner in which he took possession of the shoes and because of the actions taken by Mr. Bailey and his companions as they left the scene. We are unpersuaded that the evidence of this conduct proves beyond a reasonable doubt an agreement between Mr. Bailey and his companions to rob Ms. Reid.

Directing our attention to Ms. Reid's testimony that Mr. Bailey "snatched" the shoebox from her lap, the government cites to our case law stating that "[t]o satisfy the force requirement in a charge of robbery by stealthy seizure, the government need only demonstrate the actual physical taking of the property from the person of another . . . ." *Leak v. United States*, 757 A.2d 739, 742 (D.C. 2000) (internal quotation marks omitted). The testimony regarding Mr. Bailey's act of "snatching" may constitute evidence that Mr. Bailey robbed Ms. Reid. *See Post* at 25–35; *but see Post* at 41–48. But "the crime of conspiracy to commit robbery" requires proof that "two or more persons formed an *agreement* to commit a *robbery*." *Pearsall v. United States*, 812 A.2d 953, 960 (D.C. 2002) (emphasis added). There is insufficient basis on this record for a reasonable fact-finder to conclude beyond a reasonable doubt that Mr. Bailey's "snatching" was not a unilateral, spontaneous action, but rather part of an agreed upon plan with others to use force ("to commit a

crime of violence," D.C. Code § 22-1805a(a)(2)), particularly when this act of "snatching" was immediately preceded by the exchange of counterfeit money between Mr. Bailey and one of his companions and immediately followed by Mr. Bailey's act of throwing this counterfeit money onto Ms. Reid's lap. *Cf. Collins*, 73 A.3d at 983 ("[C]onspirators may leave room for improvisation or refinement of details *so long as they have agreed upon their fundamental goal*" (emphasis added)).

The government also highlights the fact that, after Ms. Reid realized the money was counterfeit and called out to Mr. Bailey, Mr. Bailey and his companions together yelled "roll out" and the unidentified man later displayed a weapon. The question is whether this evidence supports a conclusion that Mr. Bailey had an agreement with his companions to take the shoes from Ms. Reid against her will "by putting [her] in fear." *See supra* note 8. For different reasons, we conclude that neither of the highlighted facts supports this conclusion: the former conduct was insufficiently threatening and the latter act cannot be attributed to Mr. Bailey.

"To prove the 'putting in fear' element [of robbery], the government must establish" that the defendant engaged in some objectively "menacing conduct . . . [with the] purposeful design to engender fear in the victim"; the test is "whether the assailant acted in such a manner as would under the circumstances portend an

immediate threat of danger to a person of reasonable sensibility." *Williams*, 113 A.3d at 561 (ellipses, brackets, and internal quotation marks omitted). Even viewing the evidence in the light most favorable to the verdict and attributing the words "roll out" to all three men, these words did not objectively "portend an immediate threat of danger." *Id.* The two women testified similarly that these words simply communicated a directive that they should "leave." These words were not objectively threatening on their face, and they were uttered as the men themselves were leaving the scene, undermining an inference that they implied "an immediate threat of danger." *Id.* at 561; *cf. id.* at 561–64 (concluding the evidence was insufficient to support robbery where three individuals surrounded the complainant late at night saying "what, what, what" and the complainant handed over his wallet out of fear that he was outnumbered and that the three individuals could be armed). Even if we look to Ms. Jones's and Ms. Reid's subjective impressions of the "roll out" directive as some evidence of an objective threat, Ms. Jones's description of the yelling as "a little scary" and Ms. Reid's unparticularized testimony that she "felt threatened" "[b]y everyone" do not suffice, especially where Ms. Reid disregarded the directive to leave, continued to follow Mr. Bailey in her car, and only decided to depart after she saw the unidentified man, who was some distance behind Mr. Bailey, make a gesture that she interpreted to mean that he was armed, and then heard Ms. Jones yell that he had a gun.

There is no question that the display of a gun by the unidentified man after the two women began to follow Mr. Bailey in their car was an objectively threatening gesture. But the use of a gun to place Ms. Reid and Ms. Jones in fear is not imputable to Mr. Bailey either (1) as part of the conspiratorial agreement, or, (2) under a *Pinkerton*[13] theory of liability, as an act "committed by another co-conspirator in furtherance of the conspiracy" and "a reasonably foreseeable consequence of the conspiratorial agreement." *Collins*, 73 A.3d at 980 (internal quotation marks omitted); *see also Fitzgerald*, 228 A.3d at 439 (acknowledging that "one person's possession or use of a weapon in the commission of a crime is not automatically imputable, under co-conspira[tor] liability, to others involved in the crime").

As discussed above, there is no evidence from the group chat to indicate that Mr. Bailey's agreement with anyone to take the shoes necessarily involved or contemplated the presence, threat, or use of firearms. Nor is there any evidence prior to or during his interaction with Ms. Reid that supports a determination that Mr. Bailey had an agreement with his companions that one of them would use a weapon. *Cf., e.g., Fitzgerald*, 228 A.3d at 438–39 (relying on defendant's instructions to armed co-conspirator not to do anything to the complainant "yet"); *Richardson v.*

---

[13] *See generally Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946); *Wilson-Bey v. United States*, 903 A.2d 818, 839–42 (D.C. 2006) (en banc).

*United States*, 116 A.3d 434, 442 (D.C. 2015) (relying on threats by co-conspirator to "cut" victim spoken in presence of defendant). Instead, the fact that he paid Ms. Reid with counterfeit money obtained from one of the men and then walked away without seeking to engage, much less threaten, Ms. Reid or Ms. Jones indicates that Mr. Bailey was executing an agreed-upon plan to avoid violence or confrontation.[14] Further, there is no evidence in this record that would have rendered the unidentified man's possession and use of a weapon reasonably foreseeable to Mr. Bailey so as to support co-conspirator liability, unless we make the wholly speculative determination that anyone involved in an exchange of counterfeit money can be expected to possess a gun. Accordingly, because any nexus between Mr. Bailey and

---

[14] Although the government concedes that "there was no direct evidence of [Mr. Bailey's] knowledge" that one of his companions had a firearm, it argues such knowledge was inferable from circumstantial evidence. We disagree. The government asserts that Mr. Bailey was unsurprised that the unidentified man displayed a weapon. But the government did not present any evidence that Mr. Bailey (who was ahead of Ms. Reid's car and walking away from her) was ever in a position to see the unidentified man (who was standing behind Ms. Reid's car) gesture with or point the gun at the car, nor for that matter any evidence as to Mr. Bailey's demeanor at any point after he took possession of the shoes. The government also notes that Mr. Jackson was arrested days later for possession of a "similar firearm," and asserts the jury could have inferred it was the same gun. But the government conceded at trial that there is no evidence in the record to support such an inference. *See supra* note 5. In any event, the government fails to explain how Mr. Bailey's brother's possession of the unidentified man's gun on a later date when Mr. Bailey was not present would support an inference that on the earlier date of the arranged meeting with Ms. Reid, Mr. Bailey knew that the unidentified man was armed.

the unidentified man's possession and display of a gun winds through "the forbidden territory of conjecture and speculation," *Rivas*, 783 A.2d at 134, we conclude that the evidence is insufficient to impute the use of this gun to Mr. Bailey as a co-conspirator.

Having reviewed evidence of Mr. Bailey's texts before the shoe purchase, the transaction itself, and its aftermath, we conclude that the totality of the government's evidence is insufficient to support a conclusion that Mr. Bailey formed an agreement with anyone to take the Jordan 11s from Ms. Reid against her will "by force or violence," whether "by sudden or stealthy seizure or snatching" or "by putting [her] in fear." Accordingly, we conclude that his conviction for conspiracy to commit a crime of violence (robbery) cannot stand.

### 2. *Remand*

The fact that Mr. Bailey has prevailed on his insufficiency challenge to his conviction for conspiracy to commit a crime of violence does not necessarily permit him to evade all conspiratorial liability for his actions. In appropriate cases, this court possesses authority under D.C. Code § 17-306 (2012 Repl.) to direct the trial court to enter judgment for lesser included offenses. *Robinson v. United States*, 100

A.3d 95, 110 (D.C. 2014). Exercise of this authority must be "just in the circumstances," D.C. Code § 17-306; "[i]t must be clear (1) that the evidence adduced at trial fails to support one or more elements of the crime of which appellant was convicted, (2) that such evidence sufficiently sustains all the elements of another offense, (3) that the latter is a lesser included offense of the former, and (4) that no undue prejudice will result to the accused." *Allison v. United States*, 409 F.2d 445, 451 (D.C. Cir. 1969). Examining these conditions in the present case, we conclude that it is just and appropriate to remand to the trial court with directions to enter a judgment of guilty for a lesser included offense of conspiracy, D.C. Code § 22-1805a(a)(1).

The evidence presented at trial was legally sufficient to convict Mr. Bailey of conspiracy to commit a nonviolent criminal offense, namely, theft. Although the jury was not instructed on conspiracy to commit a criminal offense as a lesser included offense of conspiracy to commit a crime of violence,[15] in finding Mr.

---

[15] Although we have never said as much, we have no trouble discerning that the crime of conspiracy to commit a criminal offense is a lesser included offense of conspiracy to commit a crime of violence. *Compare* D.C. Code § 22-1805a(a)(1) ("If 2 or more persons conspire . . . to commit a criminal offense . . . ."), *with* D.C. Code § 22-1805a(a)(2) ("If 2 or more persons conspire to commit a crime of violence as defined in § 23-1331(4) . . . ."); *see also* D.C. Code § 23-1331(4) (enumerating acts that constitute "crime[s] of violence," all of which are criminal offenses).

Bailey guilty of the latter, the jury necessarily, actually, and permissibly found all of the elements of the former. *See Robinson*, 100 A.3d at 111–12. Mr. Bailey has never conceded the existence of conspiracy of any sort. But he conceded guilt of theft both in the trial court and on appeal. Further, there is no question he had "full notice of his potential liability" for the crime of conspiracy to commit theft, nor is there any "indication that defense presentation would have been altered" had this lesser offense been charged. *Allison*, 409 F.2d at 451. Accordingly, we order the trial court to enter a judgment of guilty for the crime of conspiracy to commit theft.

## C. The Weapon-Related Convictions

As the government acknowledged at trial and in its brief, the unidentified man's brandishing of the gun supplied the sole predicate for Mr. Bailey's weapon-related convictions on a theory of co-conspirator liability. For the reasons discussed above, *see supra* Part II.B.1., we conclude that there is insufficient evidence that the conspiracy with the unidentified man contemplated use of a weapon or that use of a weapon was reasonably foreseeable to Mr. Bailey. Accordingly, the evidence is insufficient to support Mr. Bailey's convictions of ADW, D.C. Code § 22-402 (2012 Repl. & 2021 Supp.), and PFCV, D.C. Code § 22-4504(b) (2012 Repl. & 2021

Supp.), and also does not support the sentence enhancement for robbery for being armed or having a dangerous weapon readily available. D.C. Code § 22-4502(a).

## D. Robbery

For the reasons set forth in the separate opinions of Judges Glickman and Thompson, a majority of the division concludes that the government carried its burden to prove beyond a reasonable doubt Mr. Bailey's guilt of the crime of robbery.

## III. Conclusion

For the foregoing reasons, this court reverses Mr. Bailey's conviction for conspiracy to commit a crime of violence and remands with instructions to enter in its place a judgment of guilt for the crime of conspiracy, reverses Mr. Bailey's convictions for ADW and PFCV, and affirms Mr. Bailey's conviction for robbery but vacates the "while armed" sentencing enhancement.

*So ordered*.

GLICKMAN, *Associate Judge*, pursuant to Part II.D.: I am of the view that the evidence was sufficient to support Mr. Bailey's conviction for robbery based on his sudden snatching of the shoe box from Ms. Reid's lap against her will.

To obtain a conviction of Mr. Bailey for robbery, the government needed to prove he (1) took property of some value, (2) from Ms. Reid's person or immediate actual possession, (3) against her will, (4) by force or violence, (5) and carried the property away, (6) without right and with the intent to steal it.[1] Only two of these elements are in dispute — whether the taking was accomplished by "force or violence" and whether the taking was against Ms. Reid's will. I address each in turn.

"A defendant takes property by force or violence when he or she does so 'against resistance *or* by sudden *or* stealthy seizure *or* snatching, *or* by putting in fear.'"[2] Thus, by the statute's express terms, robbery can be committed by a "sudden . . . seizure or snatching" of property. The statute's repeated use of the conjunction "or" makes clear that a sudden seizure or snatching is enough by itself for the taking to satisfy the "force or violence" element of robbery. There need be no proof that

---

[1] *See Gray v. United States*, 155 A.3d 377, 382 (D.C. 2017); *Johnson v. United States*, 756 A.2d 458, 462 (D.C. 2000); *Zanders v. United States*, 678 A.2d 556, 563 (D.C. 1996); D.C. Code § 22-2801 (2012 Repl.).

[2] *Gray*, 155 A.3d at 382 (emphases added) (quoting D.C. Code § 22-2801).

the taking was also stealthy or against resistance, or that it put the complainant in fear. There need be proof of no more "force or violence" than proof of a sudden seizure of property.[3]

A reasonable jury in this case certainly could find, beyond a reasonable doubt, that Mr. Bailey took the shoe box from Ms. Reid by a "sudden . . . seizure or snatching."[4]  As Ms. Reid described the taking in her testimony, one moment Mr. Bailey was standing outside Ms. Reid's car, observing the shoes on her lap through the window of the closed door on the driver's side.  The next moment, without any forewarning or permission from Ms. Reid, Mr. Bailey abruptly reached in the window and, she testified, "snatche[d] the box" off her lap, "thr[ew] the money on to [her] lap," and "walk[ed] off pretty fast."  In ordinary usage, to "snatch" means "to take or grasp abruptly or hastily."[5]  Ms. Reid's choice of that very word to describe the taking, along with the surprise she reported feeling when it occurred ("I was kind of stuck," she testified, "like what just went on?"), readily enabled the jury

---

[3]  *See, e.g.*, *Turner v. United States*, 16 F.2d 535, 536 (D.C. Cir. 1926) (explaining that "the requirement for force is satisfied within the sense of the statute by an actual physical taking of the property from the person of another").

[4]  *See, e.g.*, *Morales v. United States*, 248 A.3d 161, 185 (D.C. 2021) ("Reversal" for insufficient evidence "is required only 'where there is no evidence upon which a reasonable mind could fairly conclude guilt beyond a reasonable doubt.'" (quoting *Harris v. United States*, 668 A.2d 839, 841 (D.C. 1995)).

[5]  *Snatch*, *Webster's Third New International Dictionary* (1993).

to find this was a "sudden seizure" and "snatching" of her property. Moreover, Ms. Reid's account was corroborated by Ms. Jones, who "also described a quick exchange in which Ms. Reid 'lifted the box,' Mr. Bailey 'grabb[ed] it to take it' from Ms. Reid, and 'he then dropped the money in [Ms. Reid's] lap.'" *Ante* at 4 n.3.

It would be a mistake to contend that the words "sudden or stealthy seizure or snatching" should be read more narrowly, as encompassing only pickpocketing or other takings that used stealth or some prior force to avert resistance to the taking. That contention is untenable. It conflicts with the plain words of the robbery statute, with the settled judicial understanding of that statute in this jurisdiction, and with the reason Congress included the "sudden or stealthy seizure or snatching" language in the statute in the first place.

We are obliged to read § 22-2801 as it is written.[6] That means we must construe its words "according to their ordinary sense and with the meaning commonly attributed to them,"[7] and give effect to the statute's "plain meaning when

---

[6] *See Sharps v. United States*, 246 A.3d 1141, 1149 (D.C. 2021) (when interpreting statutes, we "aim . . . to ascertain and give effect to the legislature's intent," which "is to be found in the language [it] has used" (quoting *Kornegay v. United States*, 236 A.3d 414, 418 (D.C. 2020), and *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc))).

[7] *Id.* (quoting *Peoples Drug Stores, Inc.*, 470 A.2d at 753).

the language is unambiguous and does not produce an absurd result."[8]  Section 22-2801 is not ambiguous.  By its repeated use of the word "or," the statute treats sudden seizures and snatchings as forceful or violent takings in their own right, even if they are neither stealthy nor against resistance.  There is nothing absurd about that result, and we have no warrant for, in effect, reading the word "or" as if it were the word "and."

That a sudden seizure or snatching by itself satisfies the force or violence requirement in § 22-2801 is, in fact, well-settled.  In *United States v. Long*,[9] for example, the court held that appellant properly was convicted of robbery "by sudden snatching" — the evidence showed that "as complainant turned to cross the street appellant snatched his wallet from his back pocket and fled with the wallet's contents, some $13.00" — even though he was indicted for robbery "by force or violence" and he did not use stealth, violence, or intimidation.[10]  This court likewise has repeatedly recognized that a sudden (and non-stealthy) snatching by surprise is enough to support a robbery charge.[11]  And for many years, judges in the District of

---

[8]  *Id.* (quoting *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019)).

[9]  422 F.2d 712 (D.C. Cir. 1970).

[10]  *Id.* at 713, 715.

[11]  In *Pelzer v. United States*, 166 A.3d 956 (D.C. 2017), we held the evidence sufficient to sustain a robbery conviction where appellant "asked [the complainant] to use his phone, and then grabbed it from his hands and jogged away with it."  *Id.*

Columbia routinely have instructed juries in accordance with the standard model jury instruction that "[t]aking the property by sudden or stealthy seizure, or by snatching can satisfy the requirement of force or violence [in § 22-2801] if the defendant used enough force to accomplish the actual physical taking from the person of" the complainant.[12]

This was exactly what Congress intended. When Congress enacted what is now § 22-2801 in 1901, it "deliberately expanded the common law definition of

---

at 960. In *Bates v. United States*, 51 A.3d 501 (D.C. 2012), this court affirmed robbery convictions based on sudden snatchings in which the perpetrator simply surprised the complainant, grabbed a purse or tote bag off her shoulder before she could resist, and fled. *Id.* at 504–05. Similarly, in *Creek v. United States*, 324 A.2d 688 (D.C. 1974), the complainant, standing outside her home, was robbed when the perpetrator "suddenly materialized on the doorstep, pulled her pocketbook from under her arm," and immediately fled with it. *Id.* at 689. There is also *Mahoney v. United States*, 243 A.2d 684 (D.C. 1968). In that case, the complainant was "standing on the corner of 13th and U Streets, N.W., when someone approached from the rear and snatched the bag of coins from his hand." *Id.* at 685. He was "not touched in any other way *other than* the snatching of the bag from his hand." *Id.* (emphasis in original). The defendant was charged with assault and petit larceny, but in affirming his convictions, this court expressed "little doubt that Congress intended that persons who engage in conduct such as appellant was accused of here should be charged with the crime of robbery." *Id.*

[12] Criminal Jury Instructions for the District of Columbia, No. 4.300 ("Robbery") (5th ed. 2019); *see, e.g.*, *Buskey v. United States*, 148 A.3d 1193, 1201 n.7 (D.C. 2016) ("The trial court stated: . . . 'With respect to the charge of robbery, . . . the Government must prove beyond a reasonable doubt that the Defendant personally acted with the intent to take property of another through force and putting a Complainant in fear *or by sudden snatching* with the intent to steal the property.'") (emphasis added)).

robbery 'so as to include an unlawful taking of property from the person of another, by sudden or stealthy seizure or snatching, without violence or putting in fear, and with the exercise of only sufficient force to accomplish the actual taking of the property.'"[13]  "[U]nder the common law, the mere taking or snatching of property from the person of another does not constitute robbery," whether the snatching is accomplished by stealth or by surprise.[14]  That is because, in either case, "the force used is not sufficient to overcome or prevent any resistance, or to put the owner in fear; nor can it be inferred in such case that there was an intention of taking violently in the face of a resisting force."[15]  Thus, at common law, takings from the person of another by stealth or surprise, such as typical purse snatchings, were treated as a

---

[13]  *Noaks v. United States*, 486 A.2d 1177, 1179 (D.C. 1985) (quoting *Turner*, 16 F.2d at 536); *accord Neufield v. United States*, 118 F.2d 375, 390 (D.C. Cir. 1941).

[14]  *Turner*, 16 F.2d at 536.  *See, e.g.*, 4 C. Torcia, *Wharton's Criminal Law* § 464 (15th ed. Supp. 2020) [hereinafter *Wharton*] ("The taking of property from the person of another by stealth, i.e., without force or threatened force, does not constitute robbery.  Thus, the picking of a person's pocket, using only such force as is necessary to lift and remove the property from the pocket, is not robbery." (footnotes omitted)); *id.* § 465 ("The taking of property from the person of another by surprise, as by a sudden snatching, does not constitute robbery.  Thus, the sudden snatching of a purse or other property from a person's hand is not robbery." (footnotes omitted)).

[15]  *Turner*, 16 F.2d at 536.

species of larceny, not robbery.[16]  In the District, however, such "larceny from the person is classified as robbery."[17]

Judge Easterly agrees that, under the "plain language" of § 22-2801, a taking from the person of another by a sudden seizure or snatching is a robbery "assuming all other elements of the crime are present." *Post* at 43.  She argues, however, that the evidence in this case was "insufficient to support a robbery based on" a sudden snatching because the evidence did not support a finding that "Mr. Bailey's purpose was to acquire the shoes . . . *via a snatching*." *Id.* (emphasis added).  "Instead," Judge Easterly contends, "apart from the act itself, all of the evidence indicates that his purpose was to commit a theft by deception, by paying Ms. Reid with counterfeit

---

[16]  *See Wharton* §§ 464–65; *see also* 3 Wayne R. LaFave, *Substantive Criminal Law* § 20.3(d) (3d ed. 2018).  It appears this remains the rule in the majority of jurisdictions to the present day.

[17]  *Gray*, 155 A.3d at 396 (McLeese, J., concurring in part and dissenting in part); *see Carey v. United States*, 296 F.2d 422, 427 (D.C. Cir. 1961) ("[S]tatutes have been passed in many jurisdictions denouncing larceny from the person as an aggravated form of larceny, and prescribing more severe penalties therefor, although retaining the name of 'larceny' for the aggravated offense.  The District Code contains no such provision, but accomplishes the same purpose by dealing with larceny from the person under the same classification as common-law robbery." (quoting *Turner*, 16 F.2d at 536)); *see also Leak v. United States*, 757 A.2d 739, 742–43 (D.C. 2000) ("We have consistently and for many years given a broad meaning to the term 'immediate actual possession,' and have recognized that *any taking from the area encompassed by that term is a robbery* — not simply larceny." (emphasis added)).

money." *Id.* This, our colleague concludes, "precludes a determination beyond a reasonable doubt that Mr. Bailey had the requisite mens rea" to commit the offense of robbery.[18] *Id.* at 40.

This novel argument misapprehends the mens rea element of robbery; in addition, it appears to dismiss the significance of Mr. Bailey's actual conduct. The required mental state for robbery is simply the intent (or, as we may prefer to say, the purpose) to steal. It is conceded that Mr. Bailey had that intent (or purpose) when he committed a forceful taking within the meaning of the robbery statute by snatching the shoes from Ms. Reid's lap. The snatching was not accidental. Therefore, Mr. Bailey's supposed purpose to steal only in a certain way — by deception, or without committing the offense of robbery — is beside the point. It did not "preclude" his being found guilty of robbery, because whatever Mr. Bailey may have planned or wanted to do, we have to look at what he actually did. He indisputably snatched the shoes with the intent/purpose to steal them in that manner. That was enough to establish the mens rea element of robbery. There is no justification for considering the evidence as Judge Easterly proposes, "apart from the act itself." *Id.*

---

[18] Judge Easterly also contends there was insufficient evidence that Mr. Bailey's "act of snatching the shoes . . . was against Ms. Reid's will." I address that contention separately below.

Turning to the second issue in dispute, I also am of the view that a reasonable jury easily could find beyond a reasonable doubt that Mr. Bailey snatched the shoe box from Ms. Reid's lap against her will.  According to Ms. Reid, when Mr. Bailey asked "if he can see the Jordans to make sure that they were authentic," she did not hand the shoe box over to him or invite him to take it.  Instead, with understandable caution (as the jury could find), she kept the box on her lap and opened it to "show[] him the shoes."  At that moment, a reasonable jury could find, Ms. Reid was allowing Mr. Bailey to do only what he asked to do — to "see" the shoes in order to judge whether they were genuine, not to handle or take custody of them before he paid for them.  But Mr. Bailey then reached into her car, grabbed the shoe box without asking for or getting her permission, threw down his counterfeit money to quell any objections, and hastily departed (without, so far as appears, taking any time actually to inspect the shoes for authenticity).  His haste to leave is telling in itself — a reasonable jury could infer that it implied Mr. Bailey *knew* he had taken the shoes without Ms. Reid's consent.

Judge Easterly argues there was insufficient evidence of a non-consensual taking because, in her view, "all of the evidence indicates that Ms. Reid understood that Mr. Bailey was carrying out the purpose of their pre-planned meeting to purchase the shoes," she merely considered Mr. Bailey's behavior to be "weird," and

she did not object until she discovered the money was counterfeit. *Post* at 46–47. But that is not assessing the evidence, as this court must assess it, "in the light most favorable to sustaining" the jury's verdict.[19] The fact that Ms. Reid planned and expected to sell the shoes to Mr. Bailey did not require the jury to find she impliedly consented to his taking the shoes from her possession *when he did*, which was before she could inspect his payment and verify it was what she had agreed to accept. From all the circumstances (including Ms. Reid's testimony that she "was kind of stuck like what just went on?"), a rational jury could have found that Mr. Bailey grabbed the shoe box before she was willing to relinquish possession; that Ms. Reid simply was too surprised or shocked by Mr. Bailey's behavior to resist it or object to it immediately; and that his ruse lulled her into acquiescing in what he had done.

Timing and sequence are important. Mr. Bailey would not have committed a robbery if he had taken the shoes *after* Ms. Reid consented, even if he obtained her consent by trickery or deception. That would be theft by deception, not robbery[20]

---

[19] *Davis v. United States*, 834 A.2d 861, 866 (D.C. 2003).

[20] *See* Criminal Jury Instructions for the District of Columbia, No. 5.300 ("Theft") (5th ed. 2019) (suggesting that a taking by "deception" is distinct from a taking "against the will," given that they are treated as distinct ways of "wrongfully obtain[ing] the property of another"); *cf. Cash v. United States*, 700 A.2d 1208, 1211 (D.C. 1997) (upholding conviction for theft by deception where a reasonable jury could find that the complainant "would not have given" her property to the appellant "had it not been for his deception").

(unless he thereafter used force or intimidation to prevent Ms. Reid from recovering the shoes after she discovered the ruse[21]). But that is not what the evidence shows happened here. Mr. Bailey took the shoes first, when it was still against Ms. Reid's will for him to do so. So the jury reasonably could find.

THOMPSON, *Associate Judge*, pursuant to Part II.D. and dissenting from Part II.B.: Viewing the evidence in the light most favorable to sustaining the robbery and conspiracy-to-rob convictions, as we are obligated to do, I believe the evidence was sufficient to support both of these convictions. I focus on the testimony about what occurred during the asportation phase of what occurred, i.e. during Mr. Bailey's effort to carry away the shoes he had snatched from Ms. Reid.

Robbery may be proven by evidence that a defendant, "by force or violence . . . or by putting in fear, . . . [took] from the person or immediate actual possession of another anything of value." D.C. Code § 22-2801. Our case law establishes that the requisite elements of robbery include "(1) a felonious taking, (2) accompanied by an asportation [or carrying away]." *Williams v. United States*, 113 A.3d 554, 560

---

[21] *See, e.g.*, *Pleasant-Bey v. United States*, 988 A.2d 496, 504 (D.C. 2010); *Jacobs v. United States*, 861 A.2d 15, 17–18, 19–20 (D.C. 2004) (per curiam), *recalled, vacated, and reissued*, 886 A.2d 510 (D.C. 2005).

(D.C. 2015). "[S]o long as the essential ingredient of asportation continues, the crime of robbery is still in progress." *Castillo-Campos v. United States*, 987 A.2d 476, 491 (D.C. 2010) (quoting *Carter v. United States*, 223 F.2d 332, 334 (D.C. Cir. 1955); *see also People v. Cooper*, 811 P.2d 742, 748 n. 8 (Cal. 1991) ("[M]ere theft becomes robbery if the perpetrator resorts to force or fear while carrying away the loot."). "To prove the 'putting in fear' element [of robbery], the government must establish" that the defendant engaged in some objectively "menacing conduct . . . [with the] purposeful design to engender fear in the victim"; the test is "whether the assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Williams*, 113 A.3d at 561 (ellipses, brackets, and internal quotation marks omitted).

In this case, according to the testimony of Ms. Reid and her companion Ms. Jones, after snatching the box of shoes Ms. Reid was selling, throwing money into Ms. Reid's lap, and then hearing her protest that the money was fake, Mr. Bailey shouted to her to "roll out." The two men who were with Mr. Bailey likewise "simultaneously" began shouting "roll out." Ms. Reid testified that she left the area because she "felt threatened by everyone [i.e., all the men]." Ms. Jones testified that the men's yelling was "a little scary"; Jones was "a little afraid" because of what the men yelled. No wonder, because (especially when viewed in the light most favorable

to sustaining the robbery conviction) the words "roll out" were an implied threat.[1]  I have no trouble concluding that this was evidence that permitted the jury to find that Mr. Bailey and the men acting with him placed the two women in fear in order for Mr. Bailey to retain and accomplish asportation of the shoes.[2]  The evidence thus sufficed for the jury to find Mr. Bailey guilty of robbery.

My colleagues note that Ms. Reid continued to follow Mr. Bailey for a while after he yelled, "roll out."  They reason from this that Ms. Reid did not perceive Mr. Bailey's words as a threat and that his conduct was insufficiently threatening to support a robbery finding.  But, as they recognize, the test of whether words or conduct are enough to place another person in fear is an objective one.  That Ms.

---

[1]  Reported cases describe commands to "roll out" followed by violence when the victim did not move quickly enough.  *See, e.g., Solis v. Fresno Cty. Sheriff's Dep't*, No. 1:20-cv-00048-EPG (PC), 2020 U.S. Dist. LEXIS 173977, at *3, 4, 9 (E.D. Cal. Sept. 22, 2020) (recounting allegation that plaintiff pre-trial detainee was "threatened by inmates, who told him to 'roll out'"; noting that plaintiff was jumped and beaten by numerous inmates when he did not comply with that command); *Commw. v. Arnold*, No. 3660 EDA 2016, 2018 Pa. Super. Unpub. LEXIS 488, at *1-2 (Pa. Super. Ct. Feb. 15, 2018) (recounting that defendant shouted to victim to "[r]oll out" before shooting victim); *cf. Gray v. United States*, 155 A.3d 377, 387 (D.C. 2017) (recognizing that a defendant's command to a waitress "not to look at him" as he reached over a counter to a cash register was an implied threat).

[2]  *Cf. Jacobs v. United States*, 861 A.2d 15, 22 (D.C. 2004) (agreeing that if "the use of force enables the accused to retain possession of the property in the face of immediate resistance from the victim, then the taking is properly considered a robbery"), *vacated and reissued*, 886 A.2d 510 (D.C. 2005).

Reid continued to follow Mr. Bailey for a while perhaps shows that Ms. Reid is particularly brave or streetwise. (Indeed, I draw that inference from the evidence of Ms. Reid's willingness to meet a stranger at a location he designated to sell him a pair of what the case law suggests are oft-stolen athletic shoes.) But that fact does nothing to undermine an inference that Mr. Bailey's and the other men's words – demands that Ms. Reid "roll out" after she protested that Mr. Bailey gave her counterfeit money for the shoes he had grabbed from her – were objectively threatening and would cause a person of reasonable sensibility to feel threatened and in danger of immediate bodily injury if she persisted in protesting or tried to recover the shoes.[3] Nor does the fact that Ms. Reid and Ms. Jones were inside a vehicle when the "roll out" commands uttered mean that the words were insufficiently threating to render the taking a robbery. To be sure, "[t]he apparent present ability of a defendant to accomplish a threatened harm is a key component of an inquiry into whether the defendant's actions would "portend an immediate threat of danger to a person of reasonable sensibility," *Parks v. United States*, 627 A.2d 1, 5–6 (D.C.

---

[3]  *See Seaton v. Commw.*, 595 S.E.2d 9, 14 (Va. Ct. App. 2004) ("[A] brave victim maintains her fortitude [and may stand her ground] *despite* intimidation – but it is intimidation nonetheless.").

1993), but, unfortunately, the case law provides many examples of people outside of cars coming to inflict bodily harm on people inside vehicles.[4]

On the evidence presented, the jury could reasonably find that Mr. Bailey and the other men acted so as to "cause apprehension in a reasonable person that [appellant and his group were] about to apply force [if Ms. Reid did not abandon her efforts to recover the shoes or to prevent appellant from taking them away without paying]." *Spencer v. State*, 30 A.3d 891, 893 (Md. 2011). The jury could reasonably find that there was "a menace indicated by tone and manner" and "of a sort to incite reasonable apprehension of danger," "such as to put a [person] of ordinary courage in fear of bodily harm." *Davis v. Commonwealth*, 54 S.W. 959, 959 (Ky. Ct. App. 1900).

The evidence also supports an inference that Mr. Bailey and the other men had an agreement to assist him in accomplishing asportation of the shoes. "To establish the existence of a conspiracy, the government must prove (1) an agreement between two or more persons to commit a criminal offense; (2) knowing

---

[4] *See, e.g., Henderson v. State,* No. 13-14-00619-CR, 2016 Tex. App. LEXIS 7705 (Tex. Ct. App. July 21, 2016) (defendant assaulted victim after entering her vehicle that was stopped at an intersection).

participation in that agreement with intent to commit the criminal objective; and (3) during the life of the conspiracy, and in furtherance of its objective, the commission by at least one conspirator of at least one of the overt acts specified in the indictment." *Harrison v. United States*, 76 A.3d 826, 842 (D.C. 2013) (internal quotation marks omitted). The formation of a conspiracy to commit robbery requires an agreement to actually rob another person, but "[a] jury may infer the existence of an agreement from the participants' actions." *Lucas v. United States,* 20 A.3d 737, 744 (D.C. 2011). Further, "the formation of a conspiratorial agreement may be 'near instant'. . . and the same principle applies to the refinement of details." *Collins v. United States*, 73 A.3d 974, 983 (D.C. 2013) (holding that "the jury was free to infer that a conspiracy to rob developed, even if the details of the plan did not appear to be carefully choreographed from the outset or were refined within moments of the attack") (citation omitted). There is "room for improvisation or refinement of details so long as [the participants] have agreed upon their fundamental goal." *Id.*

Just as the evidence about one of Mr. Bailey's companions providing him with some or all of the counterfeit money supports an inference of an agreement for Mr. Bailey to use counterfeit money to engage in a fraudulent purchase, so the evidence that Mr. Bailey and his companions all yelled "roll out" supports an inference that the men agreed to facilitate Mr. Bailey's carrying away of the shoes without

interference or resistance from Ms. Reid.  In other words, the evidence permitted the jury to infer that Mr. Bailey and the other men conspired to complete the taking by placing the women in fear through a command that was an implied threat (that if they did not leave, harm would follow).  Unlike the evidence of Mr. Bailey's snatching the shoes, the men's yelling of "roll out" was not unilateral action.  Rather, it was action that the jury could reasonably find was in furtherance of a conspiracy that may have developed in a "near instant" as Mr. Bailey sought to depart with the shoes, rather than having been choreographed from the outset.  My colleagues in the majority do not actually contend otherwise (but reverse the conspiracy-to-rob conviction because they think the "roll out" command was insufficiently threatening to support a robbery finding – a characterization with which I disagree for the reasons set out above).

For the foregoing reasons, I dissent from the court's reversal of Mr. Bailey's conspiracy-to-rob conviction. I concur in the affirmance of his robbery conviction and in the court's disposition of his other convictions.

EASTERLY, *Associate Judge*, dissenting from II.D.:  I disagree that Mr. Bailey can stand convicted of robbery based on the record presented.  As explained above, in order to prove a robbery, the government must prove that a taking was achieved

by more culpable means: "by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear." *Ante* at 12 n.8.[1] The government must also prove that the defendant used force or violence purposefully to take the item in question, and that the taking was against the will of the person from whom the item of value was taken. *See Williams v. United States*, 113 A.3d 554, 560–61 (D.C. 2015) (explaining that the elements of robbery include a taking against another person's will with the "purposeful design" to use violence or fear and quoting *Parks v. United States*, 627 A.2d 1, 5 (D.C. 1993) (applying this "purposeful design" requirement to intent-to-frighten and attempted-battery assaults)); *see also Gray*, 155 A.3d at 383–84 (concluding that robbery "require[s] proof of some sort of purposeful employment or at least knowing exploitation of the

---

[1] Citing to the partial dissent in *Gray v. United States*, 155 A.3d 377, 392 (D.C. 2017) (McLeese, J., concurring in part and dissenting in part), Judge Glickman resuscitates language from older cases indicating that any "larceny from the person is classified as robbery." *Ante* at 31 & n.17. To the extent this language could be read expansively to permit the court to forego an inquiry into how a taking was accomplished, a position Judge Glickman does not appear to advocate, this interpretation was rejected in *Gray* because it "would completely nullify the 'by force or violence' element of robbery." 155 A.3d at 386; *see also id.* n.18 ("We recognize that there are passages . . . that, divorced from context, could be read as supporting the broad proposition advanced by the dissent that any theft from a person or his or her immediate possession constitutes a robbery. But we are unaware of any opinion binding on us that actually *holds* that this is the case—which, again, would in effect strike the 'by force or violence' element from the robbery statute—or that addresses a fact pattern remotely like the one presently before us." (citation omitted)).

force or violence").[2]  We explained above why Mr. Bailey's and his companion's directive to "roll out" does not amount to sufficient evidence that Mr. Bailey accomplished a taking by force or violence by "putting [Ms. Reid and Ms. Jones] in fear."  *See ante* Part II.B.1.  But in my view, the evidence in this case is also insufficient to support a robbery based on a taking via "sudden or stealthy seizure or snatching" for two reasons: it does not support a determination beyond a reasonable doubt that (1) Mr. Bailey purposefully accomplished a taking by that means or (2) his act of snatching the shoes—as opposed to his payment with counterfeit money—was against Ms. Reid's will.

I accept that the plain language of D.C. Code § 22-2801 reflects the determination by Congress in 1901 that a taking by "sudden" seizure or snatching is no less a robbery than a taking by "stealthy" seizure or snatching, assuming all other elements of the crime are present.  But I disagree that the particular evidence in this case supported a determination beyond a reasonable doubt that Mr. Bailey's purpose was to acquire the shoes via force or violence, namely, via a snatching.  Instead, apart from the act itself, all of the evidence indicates that his purpose was to commit

---

[2] The court in *Gray* did not resolve the mens rea question and concluded that a lesser-included offense instruction on theft was warranted regardless.  155 A.3d at 383–84.  Given the evidence presented by the government, *see infra*, I think the evidence is insufficient in this case even if knowing use of force or violence to execute a taking is all that is required.

a theft by deception, by paying Ms. Reid with counterfeit money. Mr. Bailey planned to meet with Ms. Reid in advance to purchase the Nike Air Jordan 11s, he told his friends he was going to "jug" her, *see ante* at 12–13 & n.9, and, just before he approached her, he asked for and received the counterfeit money from one of his companions. (That the counterfeit money was "good" is further evidence of Mr. Bailey's purpose to deceive Ms. Reid; he had no reason to know that she was skilled in identifying counterfeit money from her work in a casino). According to Ms. Reid, after Mr. Bailey approached her car, he "calm[ly]" asked to see the shoes to confirm they were real. He observed them for "a second or two" and told her they looked real. And then, according to Ms. Reid, in an "almost simultaneous[]" exchange he "snatched" the box containing the shoes and threw the counterfeit money (folded up, inferably to make it more difficult to inspect) in her lap, and walked away.

In other words, Mr. Bailey had a plan to purchase the shoes with counterfeit money, and he executed that plan. According to the government's witnesses, the snatching—which occurred in the midst of the execution of that plan—was merely incidental to the arranged transfer of possession. When asked to explain what she meant by her testimony that Mr. Bailey had "snatched" the shoes, Ms. Reid—who thrice testified that she could not remember and did not know whether she handed the shoebox to Mr. Bailey before he "snatched" it—explained only that Mr. Bailey

"did not stick around to get the top of the box necessarily." Likewise, Ms. Jones testified that Mr. Bailey "grabbed" the shoes in the course of the sale. According to Ms. Jones, after Ms. Reid displayed the shoes and Mr. Bailey confirmed the price, Ms. Reid lifted the box and "[Mr. Bailey] grabbed it. So it was an *exchange* . . . I don't know how you just hand a person something without them grabbing it to take it." (emphasis added).

We have said countless times that a defendant's state of mind may be inferred from their actions, but such an inference must be based on the *whole* of the evidence of their actions. *See Harrison v. United States,* 60 A.3d 1155, 1165 (D.C. 2012) (evidence of mens rea insufficient based on the examination of "the evidence as a whole" (internal quotation marks omitted)); *see also Coleman v. United States*, 515 A.2d 439, 444 n.6 (D.C. 1986) ("[I]in evaluating appellant's claim of insufficiency, this court must consider the totality of the evidence presented at trial . . . ."). If the evidence the government presented had shown nothing more than that Mr. Bailey walked up to Ms. Reid and snatched the shoebox, the totality of Mr. Bailey's conduct and the circumstances of the snatching would support an inference of Mr. Bailey's purpose to commit a taking *using force*. But here the evidence presented by the government reveals a more comprehensive picture of Mr. Bailey's actions, both before and after the snatching. That evidence, which the government has never

backed away from, undermines a theory of robbery via snatching and precludes a determination beyond a reasonable doubt that Mr. Bailey had the requisite mens rea. Put another way, although we are obligated to view the evidence in the light most favorable to the government, that obligation does not require us to disregard almost all of the government witnesses' narrative and artificially freeze the evidentiary frame at the instant the shoes changed hands.

Even if the evidence of Mr. Bailey's mens rea was sufficient, the evidence at trial still does not support Mr. Bailey's robbery conviction because the record does not reflect that Mr. Bailey's taking of the shoes from Ms. Reid was against her will. However coarse or offensive Mr. Bailey's manner was when he snatched the shoes from Ms. Reid and threw the money into her lap, all of the evidence indicates that Ms. Reid understood that Mr. Bailey was carrying out the purpose of their pre-planned meeting to purchase the shoes (but for the fact that he paid her in counterfeit bills). Ms. Reid notably did not testify that she protested when Mr. Bailey "snatched" the shoes from her. And there is no other evidence that, when Mr. Bailey took the shoes, she objected in any way, much less demanded their return. Instead, her focus was on the money. After examining it and determining that it was counterfeit (while Mr. Bailey walked away with the shoes in hand), she called out to him that the money was "fake."

Ms. Reid's testimony at trial about her reaction to the nature of the exchange "at the time" does not alter the evidentiary calculus. When the government asked her for her reaction to the "snatching," she connected it to Mr. Bailey's payment: "Well, he threw the money. . . . [I]t was weird. I was kind of stuck like what just went on[.]" She then confirmed that in the many sales she had conducted, she had never had "an experience where somebody has snatched sneakers and then thrown money at [her]." Even if we read this testimony in the light most favorable to the government, this testimony about the "*weirdness*" of the *exchange* does not amount to evidence that the snatching was against her will.

Judge Glickman acknowledges that "timing and sequence" matters and concedes that if Mr. Bailey "had taken the shoes after Ms. Reid consented, even if he obtained her consent by trickery or deception," the evidence of robbery would be insufficient. *Ante* at 34 (emphasis omitted). But he asserts that this is not what the evidence shows. Rather, "Mr. Bailey took the shoes first, when it was still against Ms. Reid's will for him to do so." *Ante* at 35. I disagree that the evidence supports this assessment beyond a reasonable doubt in light of all of the other evidence in the record, presented by the government, indicating that Ms. Reid (1) engaged in a consensual transfer of the shoes and (2) rescinded her consent only after she realized the money that Mr. Bailey gave her was counterfeit. It does not matter in my view

that her realization came swiftly after the exchange, instead of (as Mr. Bailey inferably hoped from his effort to depart quickly[3]) after Mr. Bailey had left the scene. The taking via purchase with counterfeit money was against Ms. Reid's will. The taking via snatching was not.

In short, based on the record presented at trial, a reasonable juror could not have found beyond a reasonable doubt that either party to the transaction was a participant in a robbery via snatching, either as perpetrator or victim. Accordingly, I would conclude that the government failed to prove Mr. Bailey's guilt of robbery beyond a reasonable doubt, reverse his conviction, and remand with instructions to enter a judgment of guilt on the lesser included offense of second-degree theft.

---

[3] Ms. Reid's actions and her testimony about her response to the taking are the best evidence of whether the taking via snatching was against her will. Judge Glickman looks to Mr. Bailey's swift departure as evidence that he "knew he had taken the shoes without Ms. Reid's consent." *Ante* at 33 (emphasis omitted). But, again, we cannot simply ignore the fact that Mr. Bailey was departing quickly after giving Ms. Reid counterfeit money, which was not part of the agreed upon transaction. Even drawing the inference Judge Glickman advocates, a reasonable juror could not determine solely on this basis, beyond a reasonable doubt, that Mr. Bailey took the shoes via snatching without Ms. Reid's consent.